USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1136 STEVE V. B. KELLER, Plaintiff, Appellant, v. UNITED STATES OF AMERICA, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Cyr and Boudin, Circuit Judges. ______________ ____________________ Christopher Cole, with whom Michael J. Donahue, Donahue, __________________ ____________________ ________ McCaffrey, Tucker & Ciandella, David S. Brown, and Sheehan, Phinney, ______________________________ _______________ _________________ Bass & Green, were on brief for appellant. ____________ Gretchen Leah Witt, Assistant United States Attorney, with whom ___________________ Paul M. Gagnon, United States Attorney, was on brief for appellee. ______________ ____________________ October 19, 1994 ____________________ CYR, Circuit Judge. Plaintiff Steven V. B. Keller CYR, Circuit Judge. _____________ appeals from a belated judgment dismissing his Longshore and Harbor Workers Compensation Act suit, see 33 U.S.C. 901-950, ___ 905(b) (1993) (LHWCA), to recover damages for injuries sus- tained in a fall on board a maritime vessel owned by defendant- appellee United States of America. As appellant has not demon- strated nor careful scrutiny disclosed that the unprece- dented decision-making delay in this case rendered the district court's findings unreliable, we affirm the judgment. I I BACKGROUND BACKGROUND __________ In 1978, the United States Navy converted the U.S.S. ARTHUR M. HUDDELL, a World War II Liberty Ship, into a non- motorized barge for storing and transporting maritime cable purchased by the Navy from Simplex Wire and Cable Co. The retrofitted HUDDELL was towed to Simplex's facility at Newington, New Hampshire, for cable loading in May 1979, where it remained moored for two years. The cargo hold had been adapted to house several round tanks, recessed sixteen feet into the 'tween deck. Simplex hired temporary employees known as cable loaders to descend into these tanks from the 'tween deck for the purpose of winding the incoming "wet" cable in concentric layers onto a spool. During the HUDDELL's retrofitting, the Navy installed a nonremovable metal barrier around Tank 4 to prevent workers on the 'tween deck 2 2 from falling into the tank. The barrier included two uninter- rupted safety railings located at the top of an access ladder attached to the interior wall of the tank to permit access to and from the tank floor. In order to exit the tank, a cable loader would climb to the top rungs of the ladder, at which point three options were available for getting from the tank onto the 'tween deck floor: (1) holding onto a "grab bar," which was attached to the 'tween deck floor and located six inches from the outside edge of the tank, then crawling forward and passing under the _____ lower railing and between the vertical stanchions supporting the two railings; (2) stepping in a crouched position between the _______ lower and upper railings of the barrier; or (3) climbing over the ____ top railing located approximately five feet above the 'tween deck floor. At the time Simplex hired Keller as a cable loader, he was a nonmatriculating sophomore at the University of New Hampshire. On the night of November 4, 1979, Keller went to a bar, where he and his friends drank approximately 120-160 ounces (or two six-packs) of beer between 10:00 p.m. and 11:20 p.m. Keller reported for work at about 11:30 p.m., and was assigned to Tank 4 for the first time. He and several coworkers climbed down the ladder from the 'tween deck into Tank 4 without incident, where they loaded cable until 2:00 a.m. When it came time for a work break, Keller climbed to the top of the ladder, and, according to coworker Rhonda Rossley, grabbed the lower safety railing with his left hand and placed ____ 3 3 his left foot on one of the two top rungs of the ladder. Then, ____ as he began to raise his right leg, he fell backward, neither attempting to regain his purchase nor crying out, and plummeted to the tank floor sixteen feet below, landing on his head. When a Simplex foreman administered first aid, he detected the odor of alcohol. A blood-alcohol test taken at 3:00 a.m., some three and one-half hours after Keller had reported for work, revealed a .14 blood-alcohol level, well above the .10 prima facie blood-alcohol level for demonstrating that a motor vehicle operator is under the influence. See N.H. Rev. Stat. Ann. 262.A-63 (1963) ___ (amended 1994, lowering limit to .08). Since the fall, Keller has remained amnesiac as to all events surrounding the accident. Following a seven-day bench trial on Keller's claims against the United States for negligently installing "unsafe" lighting and railings and an "unsafe" ladder in Tank 4, and for failing to warn Simplex workers of the potential danger, see 33 ___ U.S.C. 905(b), the district court ultimately awarded judgment to the United States. See Keller v. United States, No. 81-549-SD ___ ______ _____________ (D.N.H. Dec. 30, 1993).1 II II DISCUSSION DISCUSSION __________ Three principal issues must be addressed. First, did ____________________ 1Among other things, Keller alleged that (1) the ladder rungs were wet, slippery, worn, and irregularly spaced; (2) the metal railings protruded so as to make it likely that a climber would strike his head; and (3) no warning of these protrusions was posted on the ladder. 4 4 the eight-year lapse between the bench trial and entry of final judgment deprive the trial court findings of the customary deference on appeal, or violate Keller's constitutional rights to access to the courts and due process, see generally U.S. Const. ___ _________ amends. I, V ? Second, did the district court make clearly erroneous factual findings, or fail to make required findings, see Fed. R. Civ. P. 52(a), regarding the alleged breach of the ___ vessel owner's "turnover" duties of care? Third, did the dis- trict court misdefine a vessel owner's "continuing" duty to inspect or supervise cargo loading operations for developing hazards? A. The Decision-making Delay A. The Decision-making Delay _________________________ First, Keller claims that an unprecedented eight-year delay between trial and the entry of judgment, coupled with the trial judge's failure to refresh his recollection through re- course to a complete trial transcript prior to making findings of fact, resulted in a violation of his constitutional right to "access to the courts" and to due process, see U.S. Const. ___ amends. I, V; Ad Hoc Comm. on Judicial Admin. v. Massachusetts, ________________________________ _____________ 488 F.2d 1241, 1244 (1st Cir. 1973) (noting that pretrial delay ________ might violate constitutional rights if a civil litigant is "denied for too long his day in court"), cert. denied, 416 U.S. ____ ______ 986 (1974), or in a violation which warrants withholding the customary appellate deference accorded trial court findings. Cf. ___ Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 787 (1st Cir. 1990) __________ ________________ (excusing two-year delay); Fernberg v. T.F. Boyle Transp., Inc., ________ ________________________ 5 5 889 F.2d 1205, 1209 (1st Cir. 1989) (excusing two and one-half year delay). Keller attributes the purported generality in the district court findings, see infra Section II.B, to this extended ___ _____ decision-making delay, and implicitly relies on a conclusive presumption that the court was unable to make more complete and detailed findings as it could not recall the evidence presented at trial almost eight years earlier. Keller concedes that neither Chamberlin nor Fernberg __________ ________ concluded that prolonged decision-making delay, per se, requires ___ __ vacatur. Nor has he cited authority for a per se rule fixing an ___ __ outer limit on decision-making delay. Cf. Ad Hoc Comm., 488 F.2d ___ ____________ at 1244 (rejecting per se rule under Federal Constitution for ___ __ bounding decision-making delay in state court civil cases); cf. ___ also, Los Angeles County Bar Ass'n v. March Fong Eu, 979 F.2d ____ _____________________________ ______________ 697, 705-06 (9th Cir. 1992) (conducting ad hoc inquiry to deter- __ ___ mine whether pretrial delay "exceed[ed] constitutional bound- aries"). There are sound reasons for abjuring a per se rule even ___ __ in cases involving plainly excessive delay. In the first place, ad hoc appellate scrutiny is indispensable to the core deter- __ ___ mination whether delay rendered the decision unreliable. Second- ly, it is highly doubtful that direct appellate review affords "an effective means of enforcing district court timeliness." See ___ Phonetele, Inc. v. American Tel. & Tel. Co., 889 F.2d 224, 232 _______________ _________________________ (9th Cir. 1989) (delay approximating four years), cert. denied, ____ ______ 112 S. Ct. 1283 (1992). Thirdly, remands for reconsideration or 6 6 retrial yield yet further delays, exacerbating the burdens on litigants. For these reasons, and notwithstanding our parallel supervisory responsibility, see, e.g., 28 U.S.C. 1651 (mandamus ___ ____ jurisdiction); Petition of Henneman, 137 F.2d 627, 630 (1st Cir. _____________________ 1943), we consider it critically important that appellate atten- tion remain focused on ensuring that trial court findings, despite inordinate decision-making delay, not be squandered unless their reliability has been undermined. We therefore opt for careful de novo scrutiny of the entire record with a view to __ ____ whether the prolonged delay in reaching a decision rendered the trial court's findings of fact unreliable to the degree that vacation of its judgment is warranted despite the admittedly severe impediments to reliable fact-finding in the event of a remand for new trial. Cf. Barker v. Wingo, 407 U.S. 514, 532 ___ ______ _____ (1972) (long pretrial delays threaten to impair criminal defense, lest witnesses die, disappear, or suffer memory loss or distor- tion). Notwithstanding the eight-year interval between trial and judgment, for which we have been unable to glean adequate explanation, neither Keller nor the record on appeal suggests that the district court did not perform its decision-making responsibility with care. As Keller's several requests to expedite the decisionmaking process acknowledge, the district court was in no sense indifferent to its responsibility to render a decision but encountered extraordinary docket pressures at the same time it was required to give precedence to its criminal 7 7 caseload. See Speedy Trial Act, 18 U.S.C. 3161 (1993). ___ Nor would we well serve the interests of justice, or the integrity of the decision-making process, were we to presume that the absence of a complete trial transcript rendered the district court incapable of determining matters relating to witness demeanor and credibility, or to recollect or reconstruct trial testimony, through other reliable means (viz., trial notes, ___ voluminous trial exhibits). See Keller, No. 81-549-SD, slip op. ___ ______ at 16 ("The court in the course of rendering its decision has reviewed all of the exhibits . . . ."). After all, the responsi- bility incumbent on an appellant to substantiate a challenge to the sufficiency of trial court findings is not met merely with conclusory allegations that the trier of fact could not have recalled or reconstructed the evidence without a complete trial transcript. Moreover, this case does not require us to speculate as to the reliability of the trial judge's findings, since a complete trial transcript is available for the purpose. Thus, as regards the claim that the trial judge's findings themselves evince prejudice from the extended decision-making delay, we test Keller's thesis as in any other case, by inquiring whether the findings were infected with "clear error" based on our own painstaking scrutiny of the entire trial record, including a complete trial transcript. See Interstate Commerce Comm'n v. ___ ___________________________ Holmes Transp., Inc., 983 F.2d 1122, 1129 (1st Cir. 1993) (noting ____________________ that appellate court must defer to trial court fact-finding unless, after reviewing entire record, it is left with the 8 8 "definite and firm conviction that a mistake has been commit- ted"). B. The Merits B. The Merits __________ The district court made seven findings central to the merits-related challenges advanced on appeal: (1) Keller was a "longshore worker" to whom defendant owed a duty of "ordinary care," under LHWCA sec- tion 905(b),2 to provide a vessel in such condi- tion that "an expert and experienced stevedore [would] be able to exercise reasonable care to carry on its cargo operations with reasonable safety," and a duty to warn the stevedore of any latent safety defects on the vessel not reasonably discoverable by an "expert and experienced" steve- dore, Keller, No. 81-549-SD, slip op. at 9-10 ______ (quoting Scindia Steam Navigation Co. v. de los ______________________________ ______ Santos, 451 U.S. 156, 166-67 (1981)); ______ (2) Defendant's expert witness, Jan Bijhouwer, relying on "applicable" maritime safety standards in for- mulating his opinion that the HUDDELL's ladder design was "safe," proved "more persuasive" than plaintiff's competing expert, id. at 13; ___ (3) No eyewitness observed the precipitating cause of the fall (e.g., whether Keller hit his head on a ____ safety rail), id. at 11-12; ___ ____________________ 2Section 905(b) provides in pertinent part: In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . , and the employer shall not be liable to the vessel for such damages directly or in- directly and any agreements or warranties to the contrary shall be void. . . . The liabil- ity of the vessel under this subsection shall not be based upon the warranty of seaworthi- ness or a breach thereof at the time the injury occurred. 33 U.S.C. 905(b). 9 9 (4) Even if the design of the ladder deviated from "applicable" maritime safety standards in certain respects, there was insufficient evidence that these deviations caused Keller's fall. No other ______ accidents occurred on this ladder, despite the fact that no less than twelve persons climbed up or down the ladder under identical conditions immediately prior to and after Keller's accident, ___________ id. at 13; ___ (5) Keller's blood alcohol level of .14, see supra at ___ _____ p. 4, might have been a "significant [causal] factor" in the accident, Keller, No. 81-549-SD, ______ slip op. at 15; (6) If any design deviation constituted a potential "hazard," such hazard was obvious (i.e., not la- ____ tent), and could be "anticipate[d]" by a stevedore "if reasonably competent in the performance of his work," id. at 13-14; and ___ (7) Even if custom had required that defendant place a representative aboard the HUDDELL to monitor cargo loading, "a custom-generated duty to supervise and inspect does not transfer to the ship owner a duty to eradicate dangers reasonably known to and man- aged by the stevedore," id. at 14. ___ 1. The Vessel Owner's "Turnover" Duties of Care 1. The Vessel Owner's "Turnover" Duties of Care ____________________________________________ a. Applicable Law a. Applicable Law ______________ The definition of a vessel owner's duties of care under LHWCA 905(b) is a matter of law for the district court in the first instance, see Elberg v. Mobil Oil Corp., 967 F.2d 1146, ___ ______ _______________ 1149 (7th Cir. 1992); Ludwig v. Pan Ocean Shipping Co., 941 F.2d ______ ______________________ 849, 850 (9th Cir. 1991), subject to de novo review, see Williams __ ____ ___ ________ v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993). Keller claims that ______ by failing to distinguish between "turnover" and "continuing" duties, the district court misconstrued the standard of care incumbent upon a vessel owner under LHWCA 905(b). As it pertains to Keller and Simplex, in its current 10 10 incarnation the LHWCA is a strict liability statute. A longshore or harbor worker such as Keller, who incurs a work-related injury, may recover disability and medical compensation from the stevedore-employer (viz., Simplex) even though the stevedore was ____ not at fault. Conversely, an award of compensation under the LHWCA, such as Keller recovered from Simplex, is the longshore worker's exclusive remedy against the stevedore-employer. See 33 _________ ___ U.S.C. 904, 905(a); Williams v. Jones, 11 F.3d 247, 250 n.1 ________ _____ (1st Cir. 1993). Until 1972, an injured longshore worker could sue the vessel owner on two distinct legal theories: negligence and ______ _____ breach of the warranty of "seaworthiness." "Unseaworthiness" could be established more easily than negligence, simply by showing that some condition or appurtenance on board the vessel at the time of the accident was unreasonably hazardous, even if the stevedore-employer was the sole cause of the hazard. See ___ Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 (1946); Ellen M. __________________ ________ Flynn & Dale S. Cooper, 1A Benedict on Admiralty 91, at 5-2 to _____________________ 5-4 (7th ed. 1993) [hereinafter: Benedict on Admiralty]. Vessel _____________________ owners thus became virtual insurers of the on-board safety of longshore workers. Although the only legal recourse available to the nonnegligent vessel owner was an indemnification claim against the stevedore-employer, even that remedy was unavailable unless the hazardous condition or appurtenance was due to the stevedore's negligence. In 1972, the LHWCA remedial scheme underwent dramatic adjustment. Congress greatly increased 11 11 the amount of compensation recoverable from the stevedore-employ- er, repudiated the warranty of "seaworthiness" as a basis for third-party actions against the vessel owner, required the injured longshore worker to prove negligence on the part of the vessel owner, and precluded a negligent vessel owner from obtain- ing indemnification from the stevedore-employer. See 33 U.S.C. ___ 905(b); supra note 2. These changes were designed "to shift more _____ _____ ____ of the responsibility for compensating injured longshoremen to __ ___ ______________ the party best able to prevent injuries: the stevedore-employer." __________________ Howlett v. Birkdale Shipping Co., 114 S. Ct. 2057, 2063 (1994) _______ _____________________ (emphasis added). Consequently, at the present time the duties of care incumbent upon a vessel owner fall into two broad catego- ries: (i) so-called "turnover" duties those which are to be discharged before the owner consigns the vessel to the stevedore ______ for cargo loading operations and (ii) so-called "continuing" duties, such as inspection, supervision or intervention, which may persist after the stevedore commences cargo operations. See _____ ___ Scindia, 451 U.S. at 166-67, 172-76. There are two distinct sub- _______ categories of "turnover" duty, depending on whether an unreason- ably hazardous condition on board the vessel is patent or latent. (i) The Vessel Owner's "Duty of Safe Condition" (i) The Vessel Owner's "Duty of Safe Condition" __________________________________________ First, the vessel owner's "duty of safe condition" is met if the condition of the vessel when entrusted to the steve- dore poses no reasonably foreseeable risk to any worker, even __ __________ ___________ assuming a complete failure on the part of the stevedore-employer 12 12 to monitor the vessel workplace for safety. On the other hand, because longshoring is particularly dangerous, in many respects inherently so, see Johnson v. A/S Ivarans Rederi, 613 F.2d 334, ___ _______ __________________ 339 n.5 (1st Cir. 1980), few on-board appurtenances would ever satisfy such an exacting threshold. Accordingly, the "foresee- ability" standard to which a vessel owner is held under its "duty of safe condition" has been relaxed: "ordinary care under the circumstances" now governs the owner's discharge of its duty to turn the vessel over "in such condition that an expert and ______ ___ experienced stevedoring contractor, mindful of the dangers he ___________ ___________ __________ should expect to encounter, arising from the hazards of the ______ __ _________ ship's service or otherwise, will be able by the exercise of ordinary care" to conduct cargo operations "with reasonable safety to persons and property." See Federal Marine Terminals, ___ __________________________ Inc. v. Burnside Shipping Co., 394 U.S. 404, 416-17 n. 18 (1969) ____ _____________________ (emphasis added) (citation omitted). Unlike the vessel owner, however, the stevedore is subject to detailed legislative and administrative prescriptions for affording its workers a "safe" workplace. See, e.g., 33 ___ ____ U.S.C. 941 (1993); 29 C.F.R. 1918.1-1918.106, 1918.25 (1993) (implementing regulations for "ladders"); see also Scin- ___ ____ _____ dia, 451 U.S. at 170. Thus, a vessel owner "reasonably" may rely ___ on the stevedore-employer's supervision of its own employees in their interaction with and avoidance of "obvious" or "anticipat- ed" hazards foreseeably associated with stevedoring on board the owner's vessel. See, e.g., Polizzi v. M/V Zephros II Monrovia, ___ ____ _______ ________________________ 13 13 860 F.2d 147, 149 (5th Cir. 1988); Jupitz v. National Shipping ______ _________________ Co., 730 F. Supp. 1358, 1362 (D. Md. 1990) (noting that vessel ___ owner's duty is "to turn over the cargo area in a reasonably safe __________ condition; . . . not to turn over the area completely free of all hazards") (emphasis added). Conversely, under current law a vessel owner may be held liable, even for "obvious" or "antici- pated" hazards, upon a showing that the owner effectively dis- ____ abled the stevedore-employer or the longshore worker from taking _____ ameliorative measures to avoid the hazard. See Teply v. Mobil ___ _____ _____ Oil Corp., 859 F.2d 375, 378 (5th Cir. 1988); Theriot v. Bay __________ _______ ___ Drilling Corp., 783 F.2d 527, 536 (5th Cir. 1986). ______________ (ii) The Vessel Owner's "Duty to Warn" (ii) The Vessel Owner's "Duty to Warn" ________________________________ The second sub-category of turnover duty is the "duty to warn" prior to turnover, which requires the vessel owner to alert the stevedore-employer to any latent or concealed defect _____ including "any hazards on the ship or with respect to its equip- ment" which "are known to the vessel [owner] or should be known _____ ______ __ _____ to it in the exercise of reasonable care" and which "would likely be encountered by the stevedore in the course of his cargo opera- tions[,] are not known by the stevedore[,] and would not be ___ _____ ___ obvious to or anticipated by him if reasonably competent in the _______ performance of his work." Scindia, 451 U.S. at 167 (emphasis _______ added). Although Keller concedes that the trial court correctly quoted verbatim from the Scindia exegesis relating to these two ________ _______ turnover duties, Keller, No. 81-549-SD, slip op. at 10-11, he ______ 14 14 argues that the court focused its factual inquiry exclusively on ___________ whether the defendant vessel owner owed Keller a "continuing" duty of intervention. See Brief for Appellant at 27. We cannot ___ agree. Though neither the district court, nor for that matter the Scindia Court, used the term "turnover duty," the district _______ court focused directly on the two issues material to the perti- nent inquiry: (i) "[c]entral to the issue of legal fault in this litigation is whether the [original design of the] ladder at issue was causally defective," in light of "applicable safety standards" and other evidence proffered by Keller, Keller, No. ______ 81-549-SD, slip op. at 13, and (ii) whether "the notice given by ______ the presence of any such hazard" rendered it obvious, id. at 14. ___ Thus, the district court clearly identified and applied the proper duty of care. We turn then to examine its factual find- ings. b. Factual Findings on "Turnover" Duties b. Factual Findings on "Turnover" Duties _____________________________________ Keller asserts two challenges to the district court finding that the United States did not breach its turnover duties. First, he argues that the pivotal finding that the testimony of Jan Bijhouwer, defendant's expert witness on marine design, was "more persuasive" than the testimony of plaintiff's expert is so conclusory that no evidentiary basis for the finding can be gleaned from the record. See Fed. R. Civ. P. 52 ___ ("In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its _________ conclusions of law thereon . . . .") (emphasis added). 15 15 The crux of our ad hoc Rule 52(a) inquiry is whether __ ___ the trial court findings are precise and detailed enough to enable effective appellate review. See Knapp Shoes, Inc. v. ___ __________________ Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1228 (1st Cir. 1994). As ________________________ long as the factual bases essential to the court's special findings are reasonably discernible from the record, the dictates of Rule 52(a) are met. Id. (noting that the "'judge need only ___ make brief, definite, pertinent findings . . . there is no necessity for over-elaboration of detail'") (citation omitted). Contrary to Keller's contention, the district court did not begin and end its analysis with the observation that Bijhouwer's testimony was "more persuasive," but expressed one very important _________ rationale for so finding: Bijhouwer was the only expert witness ____ who based his opinion on "applicable [maritime] safety standards" __________ and on the possible consequences any "deviations" from those standards might have upon worker safety. Further, the court proceeded to point out that Keller had produced no competent evidence that the Tank 4 ladder was defective in any way. These "special findings" met the Rule 52(a) requirements. Keller next argues that the trial court's findings (e.g., that the ladder design was "generally safe," or its ____ hazardous features, if any, should have been obvious to the stevedore's employees) were based upon inherently unreliable or inadmissible evidence, or its refusal to admit or consider competent evidence entitled to greater weight. Whether the defendant breached a duty of care is a question of fact, which we 16 16 review only for clear error. See Fed. R. Civ. P. 52(a); Martinez ___ ________ v. Korea Shipping Corp., 903 F.2d 606, 609 (9th Cir. 1990); _____________________ Miller v. Patton-Tully Transp. Co., 851 F.2d 202, 205 (8th Cir. ______ _________________________ 1988). Clear error review presupposes appellate deference to trial court findings of fact unless we are left with the "defi- nite and firm conviction that a mistake has been committed." Holmes Transp., Inc., 983 F.2d at 1129. Particular deference is _____________________ due trial court findings dependent on witness credibility, see ___ DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991), to the __________ _____ degree that error is seldom considered "clear" unless the credi- bility assessments were based on testimony which was inherently implausible, internally inconsistent, or critically impeached. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985); ___ ________ ______________________ Rivera-Gomez v. de Castro, 900 F.2d 1, 4 (1st Cir. 1990). ____________ _________ Under LHWCA 905(b), the plaintiff must prove, by a _________ preponderance of the evidence, both proximate causation and a breach of the applicable duty of care. See Bjaranson v. Botelho ___ _________ _______ Shipping Corp., 873 F.2d 1204, 1208 (9th Cir. 1989); Biggs v. ______________ _____ Logicon, Inc., 663 F.2d 52, 53-54 (8th Cir. 1981). Since action- _____________ able negligence under the LHWCA depends on the fluid concept of "reasonableness" in the circumstances, the LHWCA provides little substantive guidance on vessel-owner conduct violative of the various duties of care. See Scindia, 451 U.S. at 165-66 ("Sec- ___ _______ tion 905(b) did not specify the acts or omissions of the vessel that would constitute negligence. . . . Much was left to be resolved through the 'application of accepted principles of tort 17 17 law and the ordinary process of litigation.'") (citation omit- ted). Generally speaking, the fact-finder should assess the "reasonableness" of the vessel owner's conduct "by balancing the usefulness to the [vessel] of the [allegedly] dangerous condition __________ and the burden involved in curing it against the probability and ______ ___________ severity of the harm it poses." Johnson, 613 F.2d at 348 (empha- ________ _______ sis added); see also Miller, 851 F.2d at 205 (same). And, even ___ ____ ______ though "proof of [the vessel owner's] adherence to an industry practice or custom is not dispositive on the issue of negli- ___________ gence," Martinez, 903 F.2d at 610 (citations omitted) (emphasis ________ added), often the plaintiff's case will "depend on the existence ______ of statutes, regulations and customs allocating responsibility for repairs of defective equipment [between the owner and steve- dore]," since these sources are probative of the risks a "reason- ably competent" stevedore should anticipate and manage. See 1A __________ ___ Benedict on Admiralty 94, at 5-25 (emphasis added); see also, _____________________ ___ ____ e.g., Martinez, 903 F.2d at 609 (noting, on review of summary ____ ________ judgment, that "[vessel owner] . . . submitted the affidavits of a licensed ship master and a naval architect, who claimed that the platform is standard in the industry and meets international requirements"). Keller challenges the cornerstone finding by the district court: that Bijhouwer's expert opinion was founded on a "persuasive" appraisal of "applicable" industry standards. The gist of Bijhouwer's testimony was that he personally inspected the Tank 4 ladder after Keller's fall, measured its dimensions, 18 18 and climbed out of Tank 4 several times by pulling himself under _____ the lower railing with the aid of the metal grab bar mounted in the 'tween deck floor. In twenty-four years as a marine survey- or, approximately five to ten percent of the vessels Bijhouwer had encountered were equipped with ladder-railing configurations similar to Tank 4. Bijhouwer found the Tank 4 ladder "easy" to climb, and "perfectly safe." He consulted two fixed-ladder safety standards governing "shipboard installation as opposed to land-based installation": the Maritime Administration standard (MARAD) (1965) and the American Society for Testing and Materials standard (ASTM) (1983). In Bijhouwer's opinion, both standards confirmed that the Tank 4 ladder-railing design met or surpassed applicable maritime safety standards.3 Finding no merit in Keller's other challenges to the district court's credibility determinations,4 we focus on two ____________________ 3Minor measurement "deviations" between MARAD-ASTM and Tank 4 included, inter alia: the facial width of ladder rungs (slight- _____ ____ ly over 14 inches; standard 14 inches); rungs (1-1/2 inches by 1/2 inch; standard 3/4 inch by 3/4 inch); and toe clearance behind rungs (5 inches at sides, 14 3/4 inches in middle; stan- dard minimum 5 inches). 4For example, Bijhouwer testified that a person who was exiting Tank 4 for the first time might be able to do so "blind- folded." Keller characterizes this testimony as patently in- credible, especially in view of other testimony that Tank 4 was "more difficult" to exit than the tanks on other vessels (e.g., ____ the FURMAN) then moored at Simplex. On redirect, however, Bijhouwer clarified that the ladder and grab bar combination installed in Tank 4 was so well designed that, after one trip up, _____ ___ ____ __ a climber could use it "blindfolded." Bijhouwer's redirect testimony would enable a reasonable inference that Simplex, once _______ it became acquainted with the Tank 4 configuration following turnover, was in no sense disabled from informing its employees about at least one safe method of exiting the tank. Moreover, the fact that other witnesses testified that the Tank 4 ladder 19 19 related contentions. First, Keller quarrels with the district court ruling that ASTM was an "applicable" industry standard. He points out that the ASTM was promulgated several years after Keller's fall, for the purpose of facilitating inter-vessel exchangeability of component parts, rather than promoting safety concerns. And, because Bijhouwer conceded at trial that MARAD required an unobstructed gap in the Tank 4 railing, Keller ___ contests the district court ruling that MARAD was an "applicable" industry standard and disagrees that the Tank 4 ladder substan- tially conformed with the MARAD design. These contentions cannot withstand scrutiny. Keller does not explain why a maritime safety standard like ASTM would be wholly "inapplicable" simply because it had been promulgated ______ after the accident. In this context, "applicability" connotes no statutory or regulatory compulsion to conform with a particular _______ standard. See infra note 5. Rather, "applicability" connotes ___ _____ mere relevance: that ASTM had some tendency to make it more or less likely that the defendant and Simplex would have regarded ___ the ASTM norm as a minimum safety standard for the industry. There is no evidence that general maritime safety standards changed so dramatically between 1979 and 1983 that ASTM was rendered wholly immaterial as an indicator of 1979 industry ____________________ was "more" difficult to climb did not compel a finding that it was defective, since (1) these lay witnesses testified to their personal experiences only, not to safety design; and (2) this inapposite comparison (i.e., "more difficult" as opposed to "too ____ difficult") would not show that the Tank 4 ladder was "unsafe," only that other Navy ships moored at Simplex had "safer" ladders (i.e., exceeded applicable maritime safety standards). ____ 20 20 safety practices, see Fed. R. Evid. 401, nor that ASTM was based ___ exclusively on post-1979 data. Further, in response to Keller's contention that ASTM's purpose was merely to facilitate the interchangeability of component parts, we note Bijhouwer's testimony that though the maritime standards he relied upon (including ASTM) might not be exclusively safety-oriented, there _________ ____ ___________ were "safety-related aspects to all of [these industry] stan- ___ dards." Thus, it was not clear error to find that ASTM possessed some probative value in determining industry safety practices in 1979. Even if ASTM were deemed wholly "inapplicable," howev- er, it was but one of two independent maritime safety standards ___ ___ ___________ on which Bijhouwer relied. Keller therefore would have had to hobble both the ASTM and the MARAD standards in order to prevail. ____ ___ ___ _____ Viewed as an enumeration of minimum safety recommendations for _______ the industry, MARAD is conspicuously silent on many matters ______ Keller considered pertinent to the defendant vessel owner's duty of care, including any unequivocal recommendation that a gap be left in safety railings which extend around the top of a fixed ladder. Bijhouwer testified that MARAD recommended such a gap (or removable railings) only as needed to facilitate cargo loading via the deck on which the railings are located. Here, of ___ ___ ____ __ _____ ___ ________ ___ _______ course, the cable was not loaded into Tank 4 across the HUDDELL's ______ 'tween deck where the safety railings were located, but from the main deck, down through an upper hatch and into Tank 4. He further testified that MARAD recommends such an "access opening" 21 21 only in "deck" railings near ladders, citing two plausible reasons that this would not indicate that a complete gap should ________ have been left in the Tank 4 railings: (1) the MARAD provision refers exclusively to railings on the periphery of the main or weather deck of the vessel, not to railings on lower decks, like the 'tween deck; and (2) the undefined term "access opening" _________ might reasonably mean any aperture through which a person could exit safely, such as the 27-inch space under the lower railing on _____ Tank 4. Bijhouwer's testimony likewise was bolstered by OSHA regulations, which presumably impose a heightened obligation on __________ the stevedore to provide its employees with a "safe" workplace. See 33 U.S.C. 941. Yet even the OSHA standards do not dis- ___ courage the ladder configuration found on Tank 4. See 29 C.F.R. ___ 1918.25. Thus, Keller failed to weaken Bijhouwer's interpreta- tion and application of MARAD. To the extent that the technical aspects of MARAD invited expert interpretation, the district court was entitled to rely on Bijhouwer's testimony, especially since Keller tendered no persuasive counter-interpretation: Compliance with the customs and practice of an industry, while relevant and admissible[,] is not necessarily due care. It may, howev- er, be evidence of due care and when relied ________ on by the fact finder "his findings will not be lightly disregarded unless there is a par- ____ ticularly strong showing of the unreasonable- _________ ______ _______ ness of the customary practice." 1 Martin J. Norris, The Law of Maritime Personal Injuries 9:5, ______________________________________ at 453 (4th ed. 1990) (quoting Cia Maritima Del Nervon v. James ________________________ _____ J. Flanagan Shipping Corp., 308 F.2d 120, 125 (5th Cir. 1962) ___________________________ 22 22 (emphasis added)); McGann v. Compania de Navegacio Maritima ______ _________________________________ Netumar, 586 F. Supp. 1568, 1571 (D. Md. 1984) (evidence that _______ ladder was "typical" or "standard" is probative of vessel owner's nonnegligent conduct). Van Dissell, Keller's expert witness, conceded that he never consulted the ASTM standards, and neither referenced nor analyzed MARAD before surveying the Tank 4 ladder. We think it clear that this effort fell well short of the "par- ____ ticularly strong showing," see Cia Maritima Del Nervon, 308 F.2d _________ ______ _______ ___ _______________________ at 125 (emphasis added), needed to demonstrate clear error in the trial court's decision to credit Bijhouwer's expert recommenda- tions relating to an "applicable" industry "standard." Keller concedes that van Dissell relied on three land- _____ based safety standards, or at least on safety standards not _____ intended for applications distinctively maritime in nature: Department of Defense Military Standard Human Engineering Design Criteria for Military Systems, Equipment and Facilities, MIL-STD- 1472 (1970); American National Standards Institute's (ANSI) Standard Safety Code for Fixed Ladders (1956 & 1974); and OSHA Standards for Fixed Ladders, 29 C.F.R. 1910.27 (1975).5 In general, differentials between land-based and maritime design and ____________________ 5Keller did not contend that these OSHA standards directly ________ applied to defendant. Therefore, even a failure to comply with the OSHA standards would not entitle Keller to claim negligence per se. And in fact, the OSHA standards were not directly ___ __ applicable to defendant, because (1) they do not pertain to maritime employment of longshore and harbor workers, cf. 33 ___ U.S.C. 941; 29 C.F.R. 1918.1-1918.106; and (2) they regulate only the obligations of employers, see Martinez, 903 F.2d at 611; _________ ___ ________ Bandeen v. United Carriers (Panama), Inc., 712 F.2d 1336, 1339-40 _______ ______________________________ (9th Cir. 1983) (same), and defendant was not Keller's employer. 23 23 safety codes are necessitated by the unique spatial and weight constraints on working maritime vessels. The van Dissell bench- marks undoubtedly set more stringent safety specifications than the MARAD model, and thus were relatively "safer," but Scindia __________ _______ inquires only whether Simplex could have anticipated that the ___________ vessel owner would consign a vessel with these heightened land- based safety specifications. By contrast, Bijhouwer testified that shipyards commonly consult standards, such as MARAD, in ________ _______ _____ designing and constructing merchant vessels, rather than the more ______ ____ generalized military specifications like MIL-STD-1472; and, further, that he had encountered the Tank 4 ladder configuration in at least five to ten percent of the merchant vessels he had surveyed. Second, Keller attacks, as internally inconsistent and inherently implausible, the Bijhouwer testimony that the 27-inch space beneath the lower safety railing on Tank 4 afforded an _______ adequate "access opening" according to MARAD. Bijhouwer testi- fied on deposition that a minimum vertical gap of twenty-five inches beneath the lower railing would be a "safe" "access opening" for exiting Tank 4. At trial, however, Bijhouwer conceded that the grab bar, which was 4 1/8 inches high, was set into the 'tween deck floor six inches from the ladder and the rim of Tank 4. Confronted with this configuration indicating an actual clearance of 22 7/8 inches Bijhouwer nonetheless stated that the grab bar posed no hazardous interference. He explained that there would remain at least a 25-inch clearance directly ________ 24 24 beneath the lower railing where it passed over the six-inch ledge _______ ___ ________ _____ of the tank, and that this clearance was needed only to accommo- __ ___ ____ date the height of the climber's body as he placed his knee up onto the tank ledge.6 In that position, the climber would attain maximum vertical posture (measured from stooped _______ head/shoulders to knee), at which point his body would flatten out to less than twenty-five inches as he pulled himself forward _______ and through the narrower opening between the top of the grab bar _______ and the lower railing.7 While Keller characterizes these movements as dangerously acrobatic, it is well recognized that longshore workers are called upon to cope with uncomfortable, cramped positions in the close confines of a vessel. See, e.g., ___ ____ Bjaranson, 873 F.2d at 1208 ("the men, according to the testimo- _________ ny, could have squeezed around the leg of the crane" to avoid the ________ ____________________ 6Keller argues that the method of egress endorsed by Bij- houwer was unmanageable because the climber would have to place his knee on a narrow coaming that raised 7/8 inches at the edge of the tank, which Bijhouwer conceded would "cut" into the climber's knee. In fact, however, Bijhouwer testified that a climber could place his knee "momentarily" between the coaming _______ and the grab bar, not on top of the coaming. When asked if the ___ __ ___ __ ___ _______ coaming would then "dig[] into your knee," Bijhouwer simply responded that "[y]ou can feel the coaming." ____ 7Keller likewise relies on Bijhouwer's admission that at the time he first formulated his opinion that the ladder design was safe, he had not considered the actual conditions (e.g., wet, ____ cold, artificial lighting) in Tank 4 on the night of the acci- dent. Nevertheless, when asked at trial, Bijhouwer testified that those conditions did not alter his opinion as to the safety of the ladder design. He explained, for example, that even though Keller was wearing heavy clothing at the time, the clear- ance beneath the lower safety railing would be adequate for a climber emerging from the tank, because clothing might catch on ________ ____ the railing only as a climber was backing into the tank, not as _______ ____ he was pushing forward. 25 25 hazard) (emphasis added). Further, Bijhouwer testified that the lower railing served both (i) a safety function, since it would protect an exiting climber from falling backward into the tank, and (ii) a utilitarian purpose, since it would provide Simplex ___ with the option to spool wire into Tank 4 above the 'tween deck _____ level. See Johnson, 613 F.2d at 348 (trier of fact may consider ___ _______ "the usefulness to the [vessel] of the [allegedly] dangerous __________ condition") (emphasis added); see also Miller, 851 F.2d at 205 ___ ____ ______ ("The court found that the toolbox was a necessary piece of _________ _____ __ equipment for the barge and that it was situated reasonably to _________ keep it out of the way of the workers on the barge. . . . Simi- larly, the court found that whatever hazard was presented by the counterweight was justified by its important safety purpose of _________ ______ _______ keeping the toolbox lid from snapping shut unexpectedly.") (emphasis added). According to Bijhouwer, therefore, the Tank 4 ladder incorporated at least one "safe" method of egress compatible with MARAD (i.e., "under" the lower safety railing); hence, the vessel ____ owner had not provided Simplex with an "unavoidably" hazardous ladder. See Teply, 859 F.2d at 378. Thus, even if MARAD had ___ _____ been the only "applicable" industry standard on which Bijhouwer could rely, it afforded sufficient support for the district court finding that the defendant vessel owner had discharged its turnover duty of safe condition, on the ground that Simplex should have "anticipated" and managed the equipment as designed, whatever its inherent, but avoidable, risks. ___ _________ 26 26 Keller further contends that the trial court erred in finding that any potential risks attending the use of the Tank 4 ladder were "obvious." He relies on (i) Bijhouwer's testimony that it would be "reckless" for Simplex employees to attempt to exit Tank 4 by passing between the two safety railings or "over" the top railing, and (ii) evidence that Simplex employees contin- ued to use both these methods after turnover. Keller argues that this latent design "defect" generated the independent turnover duty that the vessel owner warn Simplex or its longshore workers ____ of the hidden danger. This contention, too, is flawed. First, Keller incorrectly assumes that by adopting Bijhouwer's testimony that MARAD and ASTM were "applicable" safety standards, the trial court likewise necessarily credited Bijhouwer's expert opinion (not based on MARAD) that it would ___ have been reckless to utilize the two other methods of egress. On the contrary, however, the court did not adopt that portion of the Bijhouwer testimony but went on to note instead that Keller had proffered no evidence of any design defect whatsoever in the ___ __________ Tank 4 ladder; for example, that any accident had ever occurred ___ on the ladder when persons other than Keller used these two alternate methods under substantially similar conditions (wet, cold, artificial lighting). See, e.g., McKinnon v. Skil Corp., ___ ____ ________ __________ 638 F.2d 270, 277 (1st Cir. 1981) (subject to Rule 403 balancing, evidence of prior accidents under similar conditions admissible to show design defect); cf. Martinez, 903 F.2d at 609 (at summary ___ ________ judgment, vessel owner met burden by "offer[ing] evidence that 27 27 during the vessel's seven years of operation no longshoreman ever fell into one of the ladder openings on the lashing platforms and no complaints were lodged concerning the platforms"); McGann, 586 ______ F. Supp. at 1571 ("[N]o other accidents or complaints concerning this type of ladder have been reported . . . ."); accord Pittman ______ _______ v. Littlefield, 438 F.2d 659, 662 (1st Cir. 1971) (absence of ___________ other accidents under substantially similar conditions may be probative of "safe" condition) (applying New Hampshire law). Second, even if the district court had agreed with Bijhouwer's assessment of the risks attending the two alternate methods of egress, Bijhouwer never intimated that those methods posed hazards not readily foreseeable by Simplex. Scindia, 451 _______ U.S. at 167 (noting that duty to warn exists only if "defect" "would not be obvious to or anticipated by [stevedore] if reason- ably competent in the performance of his work"). The alleged design defect (two fixed railings) was in no sense latent. Unlike a hairline fracture in the rung of a ladder, for example, which might render the ladder configuration not reasonably safe for any unwarned usage, the juxtaposition of the two railings and ___ the absence of posted instructions put Simplex on notice that its employees, unless instructed otherwise, might attempt to exit Tank 4 in any of three ways. If Simplex had deemed Bijhouwer's "under" method the only "safe" one, it could have instructed its employees not to use the two alternate methods. Or if it consid- ered all three methods "unsafe," it could have removed the railings between the stanchions at the top of the ladder. 28 28 Relying on the fact that he was never in Tank 4 prior to the night of the accident, Keller wrongly presumes that obviousness and latency are measured by what a relatively inexpe- rienced longshore worker might observe. Instead, the Scindia ______ _______ standard turns primarily on what an "experienced" stevedore, like Simplex, reasonably would be expected to notice. By the same _______ token, if the district court correctly found that even Simplex longshore workers reasonably could be expected to recognize any _______ such defects, it surely follows that their more experienced stevedore-employer should have discovered the defects during the course of its extended two-year stewardship of the HUDDELL. See ___ Bjaranson, 873 F.2d at 1209 n.7 ("The condition of the ladder was _________ apparent and obvious when Bjaranson's employer, the stevedoring contractor, boarded the ship and assumed the control of the cargo operation. Although the condition may not have been obvious to Bjaranson at night, the fact that the condition was obvious to __ his employer eliminated whatever duty there may have been upon ___ ________ [the vessel owner] to warn the individual employees.") (emphasis added). Next, Keller contends that the district court improper- ly considered his blood-alcohol level at the time of the acci- dent, since the doctrine of pure comparative fault would not permit contributory negligence to defeat Keller's LHWCA claim, ______ but only to abate damages. See Johnson, 613 F.2d at 347; 1A ___ _______ Benedict on Admiralty 56, at 3-33. First, the district court _____________________ explicitly acknowledged that had Keller proven that the defendant 29 29 vessel owner was a cause of Keller's accident, the court could _ not have treated Keller's blood-alcohol level as a total bar to recovery under the LHWCA. See Keller, No. 81-549-SD, slip op. at ___ ______ 15 ("The court is, of course, aware that were negligence found on ____ __________ _____ __ the part of the ship owner, the intoxication of Keller . . . ___ ____ __ ___ ____ _____ would not serve necessarily to totally disqualify him from recovery.") (emphasis added). Second, under the analogous comparative fault doctrine for LHWCA compensation awards, a ____________ ______ stevedore may defend by proving that the longshore worker's injuries were caused "solely" by his intoxication, cf. 33 U.S.C. ___ 903(c). While the longshore worker initially enjoys a rebutta- ble presumption against such a finding, id. 920(c), the steve- ___ dore's defense is not unprovable. See, e.g., Walker v. Univer- ___ ____ ______ _______ sal Terminal & Stevedoring Corp., 645 F.2d 170, 173 (3d Cir. __________________________________ 1981) (finding 903(c) intoxication defense established, and noting that the rebuttable presumption "falls out of the case" once stevedore proffers "substantial evidence" that longshore worker's intoxication was sole cause of injury or death). Similarly, in a section 905(b) action, the trial court may assess the quality of the vessel owner's rebuttal evidence where the longshore worker failed to demonstrate a vessel "de- fect"8 and where the vessel owner has proffered "substantial" ____________________ 8Given the Scindia standard, evidence of Keller's high _______ blood-alcohol level cannot be wholly divorced from the threshold question whether a defective design rendered the Tank 4 ladder "unreasonably" dangerous. A written policy forbade Simplex workers from reporting to work intoxicated. Thus, Keller's blood-alcohol level would be relevant to whether the ladder con- stituted an "unreasonably" dangerous condition, since the vessel 30 30 evidence of the longshore worker's intoxication. Here, the trial court's consideration of the blood-alcohol level followed direct- ly upon its observations concerning Keller's failures of proof: (1) the absence of persuasive expert testimony that the Tank 4 __________ ______ _________ ladder design was so inferior to anticipated safety standards that the defendant vessel owner could not entrust the equipment to the stevedore's able charge; and (ii) the absence of evidence of other accidents on the ladder under substantially similar conditions. In this context, we interpret these trial court observations as an acknowledgment not only that Keller utterly failed to carry his burden of proof but that the only credible ____ evidence of possible causation (i.e., Keller's heavy drinking ____ earlier in the evening and his high blood-alcohol level one hour after the fall) in no respect implicated the defendant vessel __ __ _______ __________ owner. See supra note 8. ___ _____ Keller further claims that but for two items of evi- dence which the district court improperly ignored or excluded, we would be compelled to conclude that the district court committed clear error. First, the district court excluded the deposition testimony of eyewitness Rhonda Rossley, who expressed the opinion that Keller had hit his head on a railing prior to the fall. Nonexpert-opinion testimony is permitted only if "(1) rationally based on the perception of the witness and (2) helpful to a clear ____________________ owner, in turning over the Tank 4 ladder, reasonably could rely on compliance with the stevedore's policy on intoxication. See ___ Johnson, 613 F.2d at 348 (trier of fact must consider "the _______ probability and severity of the harm [the condition] poses"). ___________ 31 31 understanding of the witness' testimony or the determination of the fact in issue." Fed. R. Evid. 701. See Swajian v. General ___ _______ _______ Motors Corp., 916 F.2d 31, 36 (1st Cir. 1990). The trial court ____________ ruled that the proffered deposition testimony did not meet the first Rule 701 test because Rossley "did not see [Keller] strike his head, nor could she see his right hand before he fell[, nor] observe whether his left hand or his left foot first lost contact with, respectively, the railing or the ladder rung." Keller, No. ______ 81-549-SD, slip op. at 12. We review a Rule 701 ruling only for manifest abuse of discretion. See United States v. Paiva, 892 F.2d 148, 156 (1st ___ ______________ _____ Cir. 1989). We find no abuse of discretion. First, Rossley's opinion necessarily depended upon a forbidden Rule 701 "infer- ence," because she (i) neither saw Keller strike his head on the railing, (ii) nor testified to any other sensory perception from ___ which one might rationally infer such an impact (e.g., the sound ____ of impact,a sudden jolt orhalt in Keller's upwardprogress, a pre- or post-impact cry, or any outward appearance of a head wound or bleeding).9 Cf. Swajian, 916 F.2d at 36 (finding clear abuse of ___ _______ discretion in allowing lay opinion that wheel fell off rear axle before car flipped over, based exclusively on the witness's ______ observation that he first saw wheel crossing the road while the _____ ____________________ 9Although a medical doctor testified that Keller sustained an eye injury which could have been consistent with the Rossley inference, given that Keller also suffered head trauma when he landed head-first on the tank floor sixteen feet below the 'tween deck the doctor could not testify that such an inference was compelled. 32 32 flip-over was in progress). Although Keller's failure to call out or to try to regain hold of the ladder could be consistent with sudden disorientation or even unconsciousness, as a lay witness Rossley would have had no nonspeculative basis for excluding possible causes other than a blow to the head (e.g., ____ intoxication, fatigue and heavy exertion). Second, and perhaps more importantly, this was a bench _____ trial, in which the trial judge would not only determine the _____ admissibility of the evidence but serve as the ultimate trier of fact. The Rule 701 admissibility determination turns on whether the inference drawn by the nonexpert lay witness would be "help- _____ ful to . . . the determination of the fact in issue." Thus, ___ having considered the entire proffer, the trial judge excluded ______ _______ the Rossley opinion testimony because the court found no suffi- ciently reliable basis for the speculative inference on which it was based. Not only do we agree, but nothing would have required ________ the trial judge, as trier of fact, to credit the Rossley opinion had it been admitted in evidence, especially since she possessed no particular skill or experience which would have assisted the trial court's fact-finding insight. Cf., e.g., Soden v. Freight- ___ ____ _____ ________ liner Corp., 714 F.2d 498, 512 (5th Cir. 1983) (nonexpert witness ___________ with eighteen years' experience repairing trucks can give lay opinion whether truck was defective). Finally, Keller contests the exclusion of evidence that Simplex cut out the two railings on the Tank 4 ladder one day after the accident, as proof that the original ladder design con- 33 33 stituted an "unreasonably" dangerous condition. Keller suggests that this evidence was admissible notwithstanding Rule 407, which requires the exclusion of subsequent remedial repairs by the defendant only, not by nondefendants like Simplex. See Raymond ___ _______ v. Raymond Corp., 938 F.2d 1518, 1524 (1st Cir. 1991); Koonce v. _____________ ______ Quaker Safety Prods. & Mfg. Co., 798 F.2d 700, 719-20 (5th Cir. ________________________________ 1986). At best, subsequent remedial measures are considered marginally probative of prior negligence. See John H. Wigmore, ___ Evidence 283, at 174-75 (1979). In this case, moreover, defen- ________ dant could have capitalized on the very same evidence to demon- strate that Simplex was expected to make such structural altera- tions to the HUDDELL without first consulting defendant, and that defendant was entitled to rely on Simplex, as a reasonably com- petent stevedore, to take such preemptive measures provided Simplex deemed them necessary for its employees' safety. See ___ also infra note 11. Under the Scindia delineation of turnover ____ _____ _______ duty, therefore, this evidence was at least a "wash" for Keller, and actually may have helped defendant more than Keller. For _________ these reasons, we conclude that the exclusion of this evidence was at most harmless. See Fed. R. Civ. P. 61 (erroneous exclu- ___ sion of evidence harmless if it "does not affect the substantial rights of the parties").10 ____________________ 10Keller catalogues various documentary exhibits which he contends were improperly excluded. We find no error. For example, Exhibits 10, 21, and 65 were proffered to establish the contents of the contract between Simplex and defendant. This issue was mooted by the finding that the Tank 4 ladder did not 34 34 2. Post-Turnover Duties of Intervention 2. Post-Turnover Duties of Intervention ____________________________________ Leaving no ground unturned, Keller argues that the court erred in ruling that the defendant did not breach its post- ____ turnover duties: to supervise and inspect the HUDDELL during cable loading and to intervene and remedy any hazardous condition that developed following turnover. See Scindia, 451 U.S. at 172 _________ _________ ________ ___ _______ (noting that post-turnover duty to intervene to remedy unreason- ably dangerous condition may derive from custom or from the vessel owner's contractual obligation to the stevedore). Keller contends that the court (1) disregarded his claim that the contract with Simplex required the defendant vessel owner to intervene to effect any safety-related alterations during cargo operations; (2) ignored Keller's evidence that it was a customary or established practice that the defendant monitor the HUDDELL during loading operations; and (3) erred as a matter of law in ____________________ constitute an unreasonably dangerous condition. See infra ___ _____ Section II.B.2 & note 11. Exhibits 34 and 34A were largely cumulative of evidence already admitted and any noncumulative portions were provided in the van Dissell testimony. See Fed. R. ___ Civ. P. 61 (harmless error); Fed. R. Evid. 403 (governing admis- sion of "cumulative" evidence). Finally, Exhibit 73 a mock-up of a portion of the Tank 4 ladder, used for demonstrative purpos- es at trial was excludable due to failure to lay a proper foundation for its admission. See Rogers v. Raymark Indus., ___ ______ _______________ Inc., 922 F.2d 1426, 1429 (9th Cir. 1991) (admission of demon- ____ strative evidence entrusted to trial court discretion). At trial, Bijhouwer challenged the accuracy of the van Dissell measurements upon which Exhibit 73 was predicated. See United ___ ______ States v. Myers, 972 F.2d 1566, 1579 (11th Cir. 1992) (noting ______ _____ that admission turns on whether there is foundation testimony that demonstrative evidence is "fair" and "accurate" depiction of original), cert. denied, 113 S. Ct. 1813 (1993); Nichols Constr. _____ ______ _______________ Corp v. Cessna Aircraft Co., 808 F.2d 340, 353 (5th Cir. 1985) ____ ____________________ (same). Finally, relevant portions of Exhibits 91 and 91A were read into the trial record. See Fed. R. Civ. P. 61; Fed. R. ___ Evid. 403. 35 35 determining that "a custom-generated duty to supervise and inspect does not transfer to the ship owner a duty to eradicate dangers reasonably known to and managed by the stevedore." Keller, No. 81-549-SD, slip op. at 14 (citing La Martina v. Pan ______ ___________ ___ Ocean Shipping Co., Ltd., 815 F. Supp. 878, 880-81 (D. Md. __________________________ 1993)). A vessel owner's duty of care normally ceases once it has discharged its "turnover" duties and the stevedore-employer's cargo operations have begun. Nonetheless, the Supreme Court has suggested three settings in which an owner might remain under _____ some "continuing" duty to monitor, supervise, or inspect the vessel for hazards developing after stevedoring operations __________ commence. First, the vessel owner might remain under such a duty were it to retain actual physical control or custody of a portion of the vessel, or participate in stevedoring operations. Scin- _____ dia, 451 U.S. at 167. Keller concedes that these conditions were ___ not met. Second, a duty to intervene might attach in the event the vessel owner were to acquire actual knowledge that "unsafe ______ _________ conditions" had developed in the vessel's appurtenances since _________ turnover, that the stevedore-employer will not address the unsafe condition, and that the stevedore's decision not to remedy the ___ developing hazard was "obviously improvident" in the circum- stances. Id. at 174-75. Third, even absent actual control, ___ participation or knowledge, a post-"turnover" duty may arise if the vessel owner was obligated, by contract, statute or custom, 36 36 to monitor stevedoring operations for the purpose of detecting and remedying unsafe conditions. Id. at 172. ___ Keller's "continuing duty" claim was founded on the contention that the defendant vessel owner had either actual or constructive knowledge of an unreasonably dangerous condition during cable loading operations. However, he does not suggest ______ that the basic structure or design of the Tank 4 ladder changed _________ ______ _______ after cable loading began (e.g., ladder rungs displaced, loosened ____ or fractured). Therefore, the defendant could have breached no continuing duty of care to Keller, since the district court __________ supportably found that the Tank 4 ladder configuration created no "unreasonable" hazard ab initio. See Scindia, 451 U.S. at 172 __ ______ ___ _______ ("We are of the view that . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop [i.e., a malfunc- _______ tioning winch] within the confines of the cargo operations that are assigned to the stevedore."); Martinez, 903 F.2d at 611 ________ ("[T]he alleged unsafe condition [employees working on "unsafe" platform] did not develop during cargo operations; it was either safe or unsafe at the time the cargo operations began . . . ."); Pluyer v. Mitsui O. S. K. Lines, Ltd., 664 F.2d 1243, 1246 (5th ______ ____________________________ Cir. 1982) (noting "different situation" than in Scindia where _______ the "case involves the vessel's liability for hazards that antedate or are coincident with the commencement of cargo opera- ________ tions"). 37 37 Keller intimates that the relevant "change" or "devel- opment" which would have been discovered had defendant met its alleged continuing duty to monitor and intervene was the failure of Simplex cable loaders to use the Tank 4 ladder in the intended manner. Thus, Keller would interpret the district court ruling that "a custom-generated duty to supervise and inspect does not transfer to the ship owner a duty to eradicate dangers reasonably known to and managed by the stevedore" as holding that a vessel owner can never be duty-bound to intervene once an _____ on-board danger (the risk that longshore workers might resort to the "over" and "between" methods of egress) becomes "obvious" to the stevedore. We cannot subscribe to Keller's reasoning. First, as already noted, we discern no indication that the trial court credited evidence that the two alternate methods of exiting Tank 4 were not reasonably safe. Second, even if the district court had found these other methods of egress "unsafe," initially the _________ vessel owner could rely on Simplex to manage such "obvious" defects, unless and until it appeared that Simplex's decision not to take remedial measures (warnings or railing removal) was "obviously improvident" under the circumstances. Keller conced- ed, however, that Simplex, which plainly had actual or construc- tive notice as to how its longshore workers were exiting Tank 4, never received an employee complaint about the Tank 4 ladder and _____ that no accident ever occurred on the ladder either before or __ ____ after the Keller incident. Thus, evidence presented by Keller 38 38 did not begin to establish defendant's actual knowledge of the alleged "hazard" on the part of the defendant vessel owner, let alone any obvious improvidence on the part of Simplex. For the same reason, even if the defendant vessel owner had been under a contractual or custom-generated duty to monitor and intervene, Keller failed to establish a breach.11 III III CONCLUSION CONCLUSION __________ Given the exacting standards of care incumbent upon a stevedore under the LHWCA, and the supportable trial court find- ings, we are left with nothing approaching a "definite and firm conviction that a mistake has been committed." Holmes Transp., _______________ Inc., 983 F.2d at 1129. Once the trier of fact determined that ____ the Tank 4 ladder was "safe," its design compatible with "appli- cable" maritime safety standards, and any potential hazards sufficiently "obvious" to Simplex longshore workers, it followed ____________________ 11Keller argues that the contract between defendant and Simplex unambiguously provided that defendant, not Simplex, would ___ _______ bear primary responsibility for ongoing "safety" inspections and _______ modifications to the HUDDELL's work areas following turnover. Keller points to a contract provision barring Simplex from making unilateral structural alterations to the HUDDELL. From this __________ premise, he contends that Simplex was compelled to use the Tank 4 ladder in existence at turnover. We do not agree. First, contrary to the trial court's alternate finding, this argument presumes that the ladder was "unsafe." Second, the contract contemplated that Simplex would bear the primary role in deter- _______ _______ mining whether modifications were needed, even if defendant was to be consulted before "major" modifications were undertaken. In any event, this contention falls far short of demonstrating a contractual duty on the part of the vessel owner to monitor in _______ the first instance. _____ ________ 39 39 inexorably that the vessel owner was entitled to rely on Simplex, as an "expert and experienced" stevedore, to act with reasonable care in supervising its workers in their interaction with and avoidance of any such "obvious" hazards on board the vessel during cargo loading operations. Any relevant "hazard" could have been averted by Simplex in various ways, including the permanent removal of the safety railings at the top of the Tank 4 ladder, a warning on the ladder as to safe methods of egress, or simple instruction of its longshore workers. The judgment is affirmed. The parties shall bear their The judgment is affirmed. The parties shall bear their ________________________ ____________________________ own costs. own costs. _________ 40 40