**Rocco P. DiGIOVANNI, Jr., Plaintiff,**

v.

**TRAYLOR BROTHERS, INC., Defendant.**

**C.A. No. 89–0369L.**

United States District Court,
D. Rhode Island.

June 9, 1994.

**38**

Merrill J. Freidemann, Lovett, Schefrin, Gallogly & Harnett, Providence, RI, David B. Kaplan, Boston, MA, for plaintiff.

S. Michael Levin, Edwards & Angell, Providence, RI, Andrew Rothschild, Eric D. Paulsrud, Lewis, Rice and Fingersh, St. Louis, MO, for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court for decision following a bench trial. Plaintiff seeks recovery under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901, for injuries he received while working for defendant on its barge used in the construction of the Jamestown Bridge.

### FACTUAL SITUATION

Defendant is an Indiana corporation and had a place of business in Saunderstown, Rhode Island in mid 1988, when it took over the construction of the Jamestown Bridge from the prior contractor. Plaintiff was an employee of defendant who was hired as a carpenter/piledriver. Plaintiff and his colleagues were assigned the task of constructing coffer dams in the Narragansett Bay. A coffer dam is a metal enclosure built in the water. After construction of the coffer dam, water is pumped out so concrete can be poured in for building structures, such as bridge piers. In order to build a coffer dam, the pile driving crew sinks metal plates, or "piles", into the ground. In this case, these piles were driven with a vibratory hammer. The vibratory hammer is a ten ton hydraulic device which is suspended over the piles from a crane. The hammer is susceptible to wind currents when it is dangling from the crane. In order to counter the effects of the wind, two ropes are affixed to the hammer and used to steady it. These ropes are called "tag lines" and the individuals using them are known as "tag men."

The work on the coffer dams for the Jamestown Bridge project was performed from barges on the Bay. Plaintiff was part of a work crew that utilized a barge named the Betty F which was owned by defendant. The Betty F was moored on the Bay during the construction phase of the project but was maneuvered about on the water at times in order to be positioned for construction of the coffer dams and bridge piers. On its deck were the crane and the hammer plus various equipment and two small shacks. A supply barge was used to bring materials and equipment from shore and was usually moored

alongside the Betty F during piledriving activity. On the deck of the supply barge were the steel piles used to build the coffer dams as well as the power pack for the vibratory hammer. The power pack was connected to the hammer via long hoses. The power pack pumped hydraulic fluid through these hoses in order to drive the hammer.

For at least a week before the accident which is the subject of this lawsuit, hydraulic fluid had been leaking from the power pack onto the metal deck of the supply barge. This hazard was open and known by all of the workers who testified. Crew members first used a chemical absorbent known as "Speedy Dry" and later cat-box litter to absorb the fluid from the deck. They also attempted to slow the leaks by tying rags around the fittings connecting the hoses to the vibratory hammer. Several of the workers on the site complained about the slippery conditions on the barge's deck to the foreman and the union steward. Some of the workers also claimed to have told defendant's general superintendent, Ed Brush, about this situation. Mr. Brush, however, denied any knowledge of the complaints or the hazard. Other than the remedial measures taken by the workers on the supply barge, no repairs were made. Consequently, the deck of the supply barge remained very slippery for the week or so leading up to the accident.

On September 30, 1988, plaintiff was working on the Jamestown Bridge project as a tag man. He was positioned on the supply barge with his tag line. As a result of the crane's jerky motions, a great deal of tension was put on his tag line. As plaintiff attempted to steady the hammer, he walked down the length of the supply barge. When walking across the portion of the deck covered with hydraulic fluid, plaintiff slipped, lost his balance, and was dragged by his tag line until he hit the power pack. Plaintiff sustained back injuries in this incident which he claims to be permanent. Defendant received workers' compensation from defendant or its insurer for the injury and continued to receive those benefits as of the date of the trial.

In addition, plaintiff filed suit against defendant under the Jones Act and the LHWCA. The case originally went to trial before Judge Torres sitting with a jury. The jury found for the plaintiff on the Jones Act claim and awarded him money damages. Since the Jones Act and the LHWCA provide mutually exclusive remedies, the jury, in accordance with the instructions of the trial judge, did not reach the LHWCA claim. That verdict was reversed by the full panel of the First Circuit, which determined that plaintiff's claim did not fall within the Jones Act. *DiGiovanni v. Traylor Bros.*, 959 F.2d 1119, 1123–24 (1st Cir.1992) (en banc) *cert. denied* —— U.S. ——, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992). The case was ultimately remanded to this Court for trial on the LHWCA claim. After a hearing on February 10, 1993, the Court determined that the case was now a non-jury matter. Later, defendant made a motion for summary judgment which was denied on September 8, 1993. *DiGiovanni v. Traylor Bros.*, 830 F.Supp. 106 (D.R.I.1993). The case was retried before the Court sitting without a jury commencing on October 20, 1993 for three days. The matter was then taken under advisement. It is now in order for decision.

## EMPLOYERS AND VESSEL OWNERS

■ In analyzing whether defendant is liable in this case, the Court must take care to differentiate between an employer and a vessel owner. The LHWCA was enacted in 1927 to provide compensation for maritime workers injured on the job. *See Director, Office of Workers' Compensation Programs v. Perini N. River Assocs.*, 459 U.S. 297, 306, 103 S.Ct. 634, 641, 74 L.Ed.2d 465 (1983). The Act filled a gap left by several Supreme Court decisions limiting the jurisdiction of state workers' compensation laws. *See id.* at 306–7, 103 S.Ct. at 641–43. The Act is similar to state workers' compensation schemes in that common law tort liability is replaced by a no-fault compensation system for workers injured in the course of employment. *Compare* 33 U.S.C. § 904–5 *with* R.I.Gen. Laws § 28–29–20. The statute contains a limited exception, however, which allows an individual covered by the Act, who is injured by the negligence of a vessel, to sue that

vessel.[1] *Id.* § 905(b). It is to be noted that it can be a great waste of time and effort for an injured worker receiving workers' compensation benefits to sue the vessel owner for negligence. By winning that case he may gain nothing. Before he receives any money from the judgement, the employer, or its compensation carrier, must be reimbursed for any benefits received or any future benefits to be received. On top of that, the employee must cover his litigation expenses. 33 U.S.C. § 933; *Jones & Laughlin Steel Corp. v. Pfeifer* 462 U.S. 523, 530 n. 5, 103 S.Ct. 2541, 2547 n. 5, 76 L.Ed.2d 768 (1983) ("The longshoreman cannot receive a double recovery, because the stevedore, by paying him statutory compensation, acquires a lien in that amount against any recovery the longshoreman may obtain from the Vessel."); *Peters v. North River Ins. Corp.*, 764 F.2d 306, 311–12 (5th Cir.1985); *Johnson v. Sioux City & New Orleans Barge Lines, Inc.*, 629 F.2d 1244, 1245–46 (7th Cir.1980).

In the present case, defendant was both plaintiff's employer and the owner of the vessel upon which he was injured. The Supreme Court has noted that even when the employer is the vessel owner, the Act still affords a remedy. *Pfeifer* 462 U.S. at 530, 103 S.Ct. at 2547 ("[A] separate action is authorized against the vessel even when there is no independent stevedore and the longshoreman is employed directly by the vessel owner.[2]"). The LHWCA immunizes defendant from tort liability in its capacity as the employing contractor. 33 U.S.C. § 905(a). In its capacity as vessel owner, defendant may be sued for the negligence of the vessel only. 33 U.S.C. § 905(b). The Supreme Court stated in *Pfeifer,* "[A] vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." 462 U.S. at 531 n. 6, 103 S.Ct. at 2547 n. 6. This Court, therefore, must treat the defen-

dant as two separate and distinct entities: defendant as the *owner* of the Betty F and the supply barge and defendant as the *contractor* who hired plaintiff to work on the Jamestown Bridge project.

This legal distinction may seem inequitable in that it allows a vessel owner to be a negligent employer and escape liability except for workers' compensation benefits. However, this apparent inequity may be quickly dismissed when it is remembered that immunity is the rule while vessel owner liability is the exception. *Levene v. Pintail Enterprises,* 943 F.2d 528, 531 (5th Cir.1991). To merge the two capacities, permitting liability of the employer to be visited upon the vessel owner, would allow the exception to swallow the rule in clear violation of the intent of Congress. *See Castorina v. Lykes Bros. S.S. Co.,* 758 F.2d 1025, 1033 (5th Cir. 1985).

### VESSEL NEGLIGENCE

The 1972 amendments to the LHWCA replaced liability based on unseaworthiness with liability based on vessel negligence. The amendments, however, provided no guidance as to the extent of this new vessel negligence action. Consequently, courts were left to devise the standards. A split in the circuits developed that was finally resolved in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 162 n. 9, 101 S.Ct. 1614, 1619 n. 9, 68 L.Ed.2d 1 (1981).

In *Scindia,* the Supreme Court set forth three ways by which a vessel owner could be held negligent. The first might be called breach of the "turn-over duty". A duty is imposed on the vessel owner to warn the stevedore about any hidden defects which the owner knew or should have known through the exercise of reasonable care at "turn-over" time. *Id.* at 166–67, 101 S.Ct. at 1621–22.

---

**1.** As originally enacted, the Act allowed an injured worker to sue a vessel owner under the "unseaworthiness doctrine." It held the vessel owner strictly liable for injuries caused by the vessel. The doctrine was replaced by the vessel negligence provisions codified in 33 U.S.C. § 905(b). H.R.Rep. No. 1441, 92nd Cong., 2d Sess. 118, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4701–2.

**2.** Several Supreme Court decisions concerning the LHWCA have dealt specifically with longshoremen and stevedores. The principles in those decisions are applicable to all maritime employers and employees covered by the Act. *Hill v. Texaco, Inc.,* 674 F.2d 447, 451 (5th Cir. 1982); *Cook v. Exxon Shipping Co.,* 762 F.2d 750, 752 (9th Cir.1985).

Once the vessel has been entrusted to the stevedore, the shipowner, "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172, 101 S.Ct. at 1624.

The second course of action for vessel negligence recognized in *Scindia* arises where the shipowner has violated the duty to exercise due care to avoid exposing longshoremen to harm from hazards under the active control of the vessel. *Id.* at 167, 101 S.Ct. at 1622.

The third theory of vessel negligence posited in *Scindia* is based on the duty of the vessel owner to intervene and take reasonable steps to eliminate a hazard if he has actual knowledge that a condition of the vessel or its equipment poses an unreasonable risk of harm *and* the owner acquires knowledge that the stevedore, in the exercise of obviously improvident judgement, means to work on in the face of it and thus cannot be relied on to remedy it. *Id.* at 175–76, 101 S.Ct. at 1626–27; *Levene* 943 F.2d at 533.

■ Unless an injured worker proves vessel negligence in one of these three ways, the vessel owner is not subject to liability. *See Masinter v. Tenneco Oil Co.,* 867 F.2d 892, 896–97 (5th Cir.1989).

■ It is clear from the testimony presented at trial in the present case that the fluid spill was an open and obvious hazard known for some period of time by all those working in the area. Since this hazard was not hidden, the first *Scindia* duty, the "turnover" duty, has not been violated by defendant as owner in this case.

Plaintiff also cannot recover under the second theory of negligence set forth in *Scindia.* In order to recover under that approach, plaintiff must show harm from a hazard under the active control of the vessel. In this case, the power pack was not part of the equipment of the vessel. It was placed on the barge by defendant to facilitate its work as a contractor. The machinery was serviced by employees of the defendant as contractor not vessel owner. Furthermore, any spill clean up was the responsibility of employees of the contractor. It cannot be concluded here that the hazard was under control of defendant as a vessel owner in any way.

At the center of the third theory of vessel negligence under *Scindia* is the relationship between the vessel owner and the employer. The Supreme Court noted,

> As we have indicated, the legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty. The trial court, and where appropriate the jury, should thus be made aware of the scope of the stevedore's duty under positive law. But an equally necessary inquiry is whether the pertinent statutes, regulations, or custom place or assume a continuing duty on the vessel to repair defective ship's gear being used by the stevedore in the cargo operation.

451 U.S. at 176, 101 S.Ct. at 1626. The Fifth Circuit Court of Appeals has refined the criteria for the duty to intervene,

> *Scindia,* therefore, requires the existence of two basic conditions for the imposition of the shipowner's duty to intervene—the shipowner's actual knowledge of a danger to a longshoreman, and the shipowner's knowledge that the longshoreman's employer is not acting reasonably to protect its employees from that danger. The *Futo*[3] court outlined considerations that pertain to the existence of these basic conditions: whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.

*Casaceli v. Martech Int'l, Inc.* 774 F.2d 1322, 1328 (5th Cir.1985) (citations omitted); *ac-*

---

3. *Futo v. Lykes Bros. S.S. Co.,* 742 F.2d 209 (5th Cir.1984).

*cord Roach v. M/V Aqua Grace,* 857 F.2d 1575, 1582 (11th Cir.1988). The Fifth Circuit has specifically declined to adopt the narrower approach of the Third and Ninth Circuits. *Williams v. M/V Sonora,* 985 F.2d 808, 810, 812–13 (5th Cir.1993). Those courts require that in order for the duty to intervene to arise, some part of the vessel or its gear must have caused the injury at issue. *Carpenter v. Universal Star Shipping, S.A.,* 924 F.2d 1539, 1542–43 (9th Cir.1991); *see Derr v. Kawasaki Kisen K.K.,* 835 F.2d 490, 496 (3rd Cir.1987). Rather than focusing solely on the instrumentality of the injury, this Court prefers the flexible approach of the Fifth Circuit which allows a court to examine all of the circumstances surrounding an injury including the relationship between the vessel owner and the employer. *See Futo v. Lykes Bros. S.S. Co.,* 742 F.2d 209, 215–18 (5th Cir.1984). Accordingly, the Court adopts the approach of the Fifth Circuit to determine whether the vessel owner here had a duty to intervene.

The considerations expressed in *Casaceli* point away from a duty to intervene on the vessel owner in this case. The instrumentality causing the injury was operated by the contractor. The contractor had taken the responsibility to maintain the power pack by hiring mechanics to care for all of the machinery. The contractor was in a better position to appreciate the problem since it used the power pack every day. Furthermore, the hazard was open and obvious to the workers, so no warning was required. The *sole* extent of the vessel's involvement in this case was that it served as a situs for the incident. Clearly, the negligence in this case was the employer's not the vessel's. In enacting the 1972 amendments Congress did not intend for a vessel to be held responsible for the employer's negligence. H.R.Rep No. 1441, 92d Cong., 2d Sess. 118, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703–4. Accordingly, this Court concludes that defendant as vessel owner in this case had no duty to intervene.[4]

In addition, plaintiff failed to prove that defendant, in its capacity as vessel· owner,

actually knew of the contractor's unreasonableness in ignoring the hazard of fluid on the deck of the supply barge.

At trial, several members of the work crew claimed that they told Brush about the problem. In his deposition, which was introduced as evidence, Brush denied any knowledge of the fluid hazard or complaints about it. He was the general superintendent of the Jamestown Bridge project. He was in charge of marshalling and assigning the labor force for the various phases of the bridge building project. Brush reported directly to the project manager.

Assuming that Brush knew about the fluid hazard, that knowledge cannot be attributed to defendant as vessel owner. Brush was clearly working within the construction division of defendant's organization. His duties had nothing to do with the vessel's ownership. Plaintiff failed to prove that any member of defendant's management team, as vessel owner, actually knew of the hazard and the contractor's failure to correct it through those responsible for the construction work on the bridge.

In short, plaintiff has simply failed to prove any vessel negligence in this case.

### CONCLUSION

Since plaintiff has failed to prove that defendant was negligent in its capacity as vessel owner, plaintiff cannot recover damages in this case. He will have to be content with collecting his workers' compensation benefits.

Accordingly, the Clerk will enter judgement for the defendant forthwith.

It is so ordered.

---

**4.** Even had the Court adopted the approach of the Ninth and Third Circuits, no duty would have

arisen because the injury was caused by the contractor's equipment and not the ship's gear.