75 F.3d 736
 1996 A.M.C. 1113, 64 USLW 2507
 Mark MOREHEAD, Plaintiff, Appellant,
v.
ATKINSON-KIEWIT, J/V, et al., Defendants, Appellees.
 No. 94-1581.
 United States Court of Appeals,
First Circuit.
 Heard March 2, 1995.
Decided Feb. 6, 1996.
 
 Thomas M. Bond, with whom David B. Kaplan and The Kaplan/Bond Group, Boston, were on brief, for appellant.
 Kathleen B. Carr, with whom Thomas E. Clinton, Robert E. Collins and Clinton & Muzyka, P.C., Boston, were on brief, for appellees.
 Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.
 LEVIN H. CAMPBELL, Senior Circuit Judge.
 
 
 1
 Plaintiff Mark Morehead, a harbor worker injured while working on a construction barge, appeals from a judgment dismissing his negligence action against Atkinson-Kiewit, J/V ("A-K"), a firm that was both his employer and charterer of the barge. Morehead brought this action under section 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 et seq., authorizing covered employees to sue a vessel as a third party for injury caused by the negligence of the vessel. In its capacity as Morehead's employer, A-K is immune from tort actions brought by covered employees like Morehead. But as the bare boat charterer of the barge on which Morehead was injured, A-K is deemed also to be the statutory vessel owner; and it was in this capacity that A-K was sued.
 
 
 2
 The case raises difficult questions of first impression in this circuit as to the liability of a so-called dual capacity employer under the LHWCA. In particular, we must decide how to assess whether A-K's alleged negligence occurred in its vessel capacity (allowing suit to be brought under section 905(b)) or in its employer capacity (immunizing it from suit). While the Supreme Court has endorsed the bringing of section 905(b) negligence actions against a dual capacity defendant in its vessel owner capacity, the Court has yet to define, in such a case, the point at which employer responsibility ends and vessel responsibility begins. Nor has the Court decided to what extent principles laid down in stevedore cases involving a separately owned vessel apply to claims by non-stevedore harbor workers.
 
 I. Background
 
 3
 Mark Morehead was employed by A-K, a joint venture formed between Guy Atkinson Co. and Kiewit Eastern to complete the construction of the Jamestown Bridge spanning Narragansett Bay in Rhode Island. In order to transport materials and equipment around the bay to the work sites, A-K bare boat chartered several barges. The barges involved in this case, the CHER 106 and the HUGHES 707, were flat deck barges--floating platforms bare of structures or equipment. A-K also leased two tugs from Woods Hole Towing Co. to transport the barges where needed. The tugs themselves were crewed by Woods Hole employees.[1]
 
 
 4
 A-K hired carpenters from a local union to build the bridge. Their responsibilities included cutting timbers and steel and setting up concrete forms for pours. As union requirements prevented the tug captain or crew from handling the lines on the barges, some carpenters also tended the lines on the barges as "scowmen." Morehead's regular duties included both carpentry and linehandling.
 
 
 5
 On January 29, 1990, Morehead and another carpenter/scowman, Steven Breault, were untying the HUGHES 707 from the CHER 106. A barge was to be surveyed in connection with her going off hire. A tug stood nearby. The barges were not at this time carrying materials or equipment, but rather were set off on the north side of the Davisville Pier. Breault threw a heavy line to Morehead, who, in attempting to catch it, stepped backwards into an open hatch which was flush with the deck on one of the barges. The district court noted conflicting testimony as to which barge Morehead was on when injured,[2] but concluded that in any event, the single open hatch was insufficiently obvious. Breault testified that he had opened the hatch on the HUGHES (which he named as the barge to be surveyed) a few days before the accident, because A-K was preparing for an off-hire survey before returning the barge to the owner. Breault testified that a supervisor carpenter had told him to open the hatch.
 
 
 6
 Morehead filed a complaint against A-K and Woods Hole on April 22, 1991, alleging Jones Act negligence, unseaworthiness, maintenance, and cure, and negligence under section 905(b) of the LHWCA. Following the denial of A-K's motion for summary judgment, Morehead voluntarily withdrew all claims except his claim for negligence under the LHWCA. A bench trial commenced on April 11, 1994. On April 29, 1994, the district court issued its Findings and Order dismissing Morehead's complaint and A-K's cross-claim against Woods Hole. It wrote:
 
 
 7
 [T]he court does not find it negligence of [appellee] viewed in its capacity as pro hac vice owner. Rather, it appears to be a temporary condition created by it solely in its capacity as charterer.... These two capacities are legally separate, even though they be the same individual.
 
 
 8
 This passage confusingly distinguishes between an owner pro hac vice and a bare boat charterer (the statute includes both in its definition of "vessel," see 33 U.S.C. § 902(21)). The parties agree that the district court actually meant to distinguish between the appellee as vessel and as employer. We also interpret the district court's order in that fashion.
 
 
 9
 Judgment was entered on May 4, 1994 in A-K's favor. This appeal followed.
 
 II. Standard of Review
 
 10
 A district court's fact-based findings relative to negligence are reviewable only for clear error. See, e.g., Levene v. Pintail Enters., 943 F.2d 528, 535-36 (5th Cir.1991), cert. denied, 504 U.S. 940, 112 S.Ct. 2274, 119 L.Ed.2d 201 (1992). However, the question of whether the district court applied the proper standard of care is one of law, subject to de novo appellate review. See, e.g., Keller v. United States, 38 F.3d 16, 22-23 (1st Cir.1994); Elberg v. Mobil Oil Corp., 967 F.2d 1146, 1149 (7th Cir.1992).
 
 
 11
 The lower court did not explain the criteria it applied in deciding what duties of care to attribute, respectively, to A-K in its separate capacities as LHWCA employer and as owner (charterer) of the barge. Rather, it simply cited along with its conclusions existing precedent relative to section 905(b) liability, e.g., Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), and Castorina v. Lykes Bros. S.S., 758 F.2d 1025 (5th Cir.), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). The factual circumstances of these and related cases, however, are too removed from those here to reveal the precise standards and analysis that were applied in this case. Nor does the language of the LHWCA provide clear guidance. We can only hope that the Supreme Court will eventually elucidate the standards applicable to dual status employers of harbor workers in circumstances comparable to these. Until then, we do our best to outline the legal principles that, we believe, govern the facts presented here. Under those principles--and giving due deference to the district court's authority as fact finder--we affirm the judgment below.
 
 III. "Vessel" Status
 
 12
 We dispose first of a less troublesome issue. The district court provisionally assumed that the barge on which Morehead was injured was a "vessel" within the LHWCA, although it found no need to decide the matter. Section 905(b) permits an LHWCA employee to sue in negligence only "[i]n the event of injury ... caused by the negligence of a vessel." Section 902(21) of the LHWCA defines "vessel" to include a bare boat charterer among the parties that may be held liable under section 905(b). A-K has not contested its status as bare boat charterer. Nor has it asserted on appeal any reason to conclude that the HUGHES and CHER were not among the structures included as "vessels" under the LHWCA. See, e.g., Kathriner v. Unisea, Inc., 975 F.2d 657, 662 (9th Cir.1992) (to determine whether a structure is a "vessel" under the LHWCA, most courts have applied the general definition in 1 U.S.C. § 3 of a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"); accord DiGiovanni v. Traylor Bros., 830 F.Supp. 106, 108-109 (D.R.I.1993). The LHWCA definition of "vessel" is more inclusive than that used for evaluating seaman status under the Jones Act.[3] For present purposes, we shall assume without deciding that both barges were vessels under the LHWCA, for the negligence of which a section 905(b) claim may be brought.
 
 IV. Statutory Framework
 
 13
 The LHWCA establishes a comprehensive federal worker's compensation scheme which holds employers liable, irrespective of fault, for securing the payment of compensation to qualified maritime employees injured in the course of their employment. 33 U.S.C. § 904.[4] This liability of employers is termed "exclusive." Id. § 905(a).
 
 
 14
 Section 905(b) of the Act authorizes certain covered employees to sue the vessel as a third party if their employment injury was caused by the negligence of the vessel.[5] But employees may no longer sue the vessel on a strict liability theory for her "unseaworthiness,"[6] Congress having eliminated the latter as a remedy for longshore and harbor workers in the 1972 Amendments to the LHWCA. The 1972 Amendments require employees to show fault of the vessel, bar a vessel's attempt to obtain indemnification from the employer, and otherwise have increased the worker's compensation recoverable from an employer. See Addison v. Bulk Food Carriers, Inc., 489 F.2d 1041, 1042 (1st Cir.1974). Focusing on longshore workers who, to date, have been the occupational group chiefly discussed in Supreme Court cases under the LHWCA, the Court described these changes as designed "to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." Howlett v. Birkdale Shipping Co., --- U.S. ----, ----, 114 S.Ct. 2057, 2063, 129 L.Ed.2d 78 (1994); see also Keller, 38 F.3d at 23.
 
 
 15
 In 1984 Amendments to the LHWCA, Congress further narrowed the availability of negligence actions by certain categories of harbor workers against a vessel in circumstances where the employer was also the owner of the offending vessel. In these so-called "dual capacity" cases, Congress barred employees providing "shipbuilding, repairing, or breaking services" from suing the employer-vessel owner for negligence in any capacity. 33 U.S.C. § 905(b). The Amendments did not purport to prohibit LHWCA employees other than in the described categories from suing for negligence in dual capacity cases. See H.R.Rep. No. 98-570(I), 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 2734, 2741 (hereafter 1984 U.S.C.C.A.N.) ("The Committee intends that this language [in § 905(b) ] not be construed to limit an employee's right to bring a cause of action, except in the circumstances indicated within the language."); cf. Guilles v. Sea-Land Serv., Inc., 12 F.3d 381, 386 (2d Cir.1993) (affirming relief cook's judgment against negligent employer-vessel owner and explaining that "[t]he 1984 change ... shows that Congress knew how to preclude a class of employees from being able to sue an employer-vessel if it chose to do so"); Gay v. Barge 266, 915 F.2d 1007, 1010 (5th Cir.1990) ("[T]he § 905(b) bar is specific to the occupations listed: shipbuilders, ship repairers and ship breakers.").
 
 
 16
 The Supreme Court had previously interpreted section 905(b) to permit covered employees to bring third-party negligence actions against their employer qua vessel owner. See Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 530-32, 103 S.Ct. 2541, 2547-48, 76 L.Ed.2d 768 (1983) (explaining that if Congress had intended to exempt employer-vessel owners from negligence suits, then the sentence in section 905(b) barring recovery from them where fellow longshore workers caused the injury would have been unnecessary). As Morehead's occupational category does not fall within any of those Congress expressly excepted in the 1984 Amendments, supra, Jones & Laughlin would appear to allow Morehead to bring a third-party negligence action against A-K in its vessel capacity.[7] To prevail, Morehead has to show that any negligence on A-K's part is attributable to it as vessel rather than as Morehead's insured LHWCA employer.
 
 
 17
 V. Defining the Vessel's Duty of Care: The Supreme Court Cases
 
 
 18
 As Jones & Laughlin allows Morehead to bring a third-party action against the vessel owner that is simultaneously his employer, we are left to ascertain the contours of the duty of care owed to Morehead by A-K in its distinct capacity as vessel. Such a definition is needed in order to decide whether the alleged negligence--the open hatch and failure to warn--is attributable to A-K qua vessel owner rather than qua employer. Congress left to the courts the task of defining the applicable duty of care. See Howlett, --- U.S. at ----, 114 S.Ct. at 2063 ("Because Congress did not 'specify the acts or omissions of the vessel that would constitute negligence,' the contours of a vessel's duty to longshore workers are 'left to be resolved through the "application of accepted principles of tort law and the ordinary process of litigation." ' ") (citing Scindia, 451 U.S. at 165-66, 101 S.Ct. at 1620-21).
 
 
 19
 In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court considered the duty of care that a vessel owner owed to an injured longshore worker who was employed by an independent stevedoring firm. For this common triangular relationship at least--vessel, stevedore, and longshore worker[8]--the Court held that limiting the vessel's duty of care so as to put the chief responsibility upon the independent stevedore was consistent with Congress' intent to permit third-party negligence actions against the vessel but to eliminate the vessel's no-fault liability (the "unseaworthiness" claim). In Howlett, a case that also involved a longshore worker suing an independent vessel, the Court restated the vessel's limited residual duties:
 
 
 20
 The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations.... The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." ... The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.
 
 
 21
 Howlett, --- U.S. at ----, 114 S.Ct. at 2063 (citations omitted) (emphasis added).
 
 
 22
 This court recently applied these duties in Keller v. United States, 38 F.3d 16 (1st Cir.1994), a case also involving the triangular relationship of vessel, stevedore, and longshore worker. We described two duties of a vessel prior to "turnover": the "duty to warn" and the "duty of safe condition." Id. at 23-24. We further described three "continuing" duties of care:
 
 
 23
 First, the vessel owner might remain under such a duty were it to retain actual physical control or custody of a portion of the vessel, or participate in stevedoring operations. Scindia, 451 U.S. at 167, 101 S.Ct. at 1622.... Second, a duty to intervene might attach in the event the vessel owner were to acquire actual knowledge that "unsafe conditions" had developed in the vessel's appurtenances since turnover, that the stevedore-employer will not address the unsafe condition, and that the stevedore's decision not to remedy the developing hazard was "obviously improvident" in the circumstances. Id., at 174-75, 101 S.Ct. at 1625-26. Third, even absent actual control, participation or knowledge, a post-"turnover" duty may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations for the purpose of detecting and remedying unsafe conditions. Id. at 172, 101 S.Ct. at 1624-25.
 
 
 24
 Id. at 32.
 
 
 25
 Keller affirmed a judgment that an independent vessel owner had breached neither its turnover nor its continuing duties to a longshore worker who had fallen from a ladder on board the vessel. We ruled that the district court had not erred in relying on testimony based on industry standards, which indicated fulfillment of the turnover duty. We also found no breach of a continuing duty of the vessel, where the allegedly dangerous condition developed during cable loading operations which were under the stevedore's control.
 
 
 26
 As did the Supreme Court in Scindia, this court noted the independent stevedore's greater skill and expertise relative to the vessel's, making the former better positioned than the vessel to prevent employee injury, and the traditional stevedoring warranty to perform competently. See id. at 29-30; see also Howlett, --- U.S. at ----, 114 S.Ct. at 2065 ("The rule relieving vessels from this general duty [to exercise reasonable care to discover dangerous conditions that develop] rests upon 'the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations.' ") (citation omitted); Scindia, 451 U.S. at 172, 101 S.Ct. at 1624 ("[the 1972 Amendments] did not undermine the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations"). Further supporting the vessel owner's justifiable reliance on the stevedore is that the latter is "subject to detailed legislative and administrative prescriptions for affording its workers a 'safe' workplace." Keller, 38 F.3d at 24 (citing 33 U.S.C. § 941 and accompanying regulations, 29 C.F.R. §§ 1918.1-1918.106, § 1918.25, and Scindia, 451 U.S. at 170, 101 S.Ct. at 1623).
 
 
 27
 In Scindia and Howlett the Supreme Court outlined a vessel owner's duties of care relative to a longshore worker employed by an independent stevedore.[9] But the Supreme Court has not yet had occasion to analyze the vessel's duties in a dual capacity case.[10] Nor has the Court considered to what degree its Scindia analysis applies to non-longshoring harbor workers, whose duties and modus operandi often differ considerably from those of longshore workers.[11] The Court has said, though, that "[o]f course, [section 905(b) ] does make it clear that a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' [the insured employer] capacity." Jones & Laughlin, 462 U.S. at 531 n. 6, 103 S.Ct. at 2547 n. 6.
 
 
 28
 How to distinguish between vessel owner negligence and employer negligence--where the same entity is both vessel owner and employer--is key here, because Morehead's statutory right to sue is solely for injury caused by vessel negligence. For work injuries resulting from employer negligence, Morehead must accept the worker's compensation prescribed under the LHWCA.
 
 
 29
 A further matter complicates this case: as the defendant has two capacities, so too, it might be said, does the plaintiff. Morehead was a carpenter, but was hired to perform both carpentry and scowmen's duties. A-K did not employ a separate crew on its barges.[12] As we will discuss further below, this "double dual capacity" aspect of the case is a factor to be considered in determining whether negligent acts are properly attributable to a defendant as vessel.[13]
 
 VI. Lower Court Precedent
 
 30
 While the Supreme Court has said little about dual capacity cases beyond allowing such defendants to be sued in their vessel owner capacity, some circuits have decided cases similar to ours. They have asked whether the alleged negligence was due to the defendant qua employer or qua vessel, with recovery allowed only in the latter instance. And, principles borrowed from Scindia have been applied to harbor workers as well as longshore workers.
 
 
 31
 Applying Scindia to a dual capacity defendant raises questions even in the longshoring context. For example, if a defendant is aware of a defect in the work area as stevedore employer, should such awareness also be attributed to it as vessel owner? And as we note supra, Scindia and Keller emphasized a vessel owner's reliance upon the presumed expertise of the stevedore, an independent contractor. Where the vessel owner is also the stevedore, is it reasonable to attribute such reliance?
 
 
 32
 Concerns of this nature led the Second Circuit in Fanetti v. Hellenic Lines Ltd., 678 F.2d 424 (2d Cir.1982), cert. denied, 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1387 (1983), to indicate that a longshore worker's claim against a dual capacity defendant would be analyzed differently from a claim against a separate shipowner brought by the employee of an independent stevedore. In Fanetti, a longshore worker was injured on deck by an unsafe condition. The dual capacity defendant argued that 1) in its role as employer-stevedore, it was primarily responsible for the safety of the workplace, and 2) as vessel owner, it should be able to rely upon its expertise as stevedore, thereby avoiding liability as vessel for the negligence.
 
 
 33
 The Second Circuit rejected the defendant's attempt to escape liability in negligence as vessel by seizing its "employer hat." Relying on a dissent by Judge Friendly in Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 687 (2d Cir.) (Friendly, J., dissenting), cert. denied, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978), the court of appeals ruled that a vessel assumes a greater duty of care when there is no independent employer responsible for workplace conditions, upon whom the vessel owner may rely to oversee the safety of the workplace on board. See Fanetti, 678 F.2d at 428 (citing Canizzo, 579 F.2d at 689-690).
 
 
 34
 Rearranging duties of care as in Fanetti raises serious problems, discussed hereafter, by enlarging an employer's tort liability beyond the purposes of the 1972 Amendments. Cf. Howlett, --- U.S. at ----, 114 S.Ct. at 2063. Fanetti, moreover, was decided before Jones & Laughlin was handed down in the Supreme Court. We doubt that the Second Circuit today would endorse Fanetti's broadened duty of care, given the Supreme Court's remark "that a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity." Jones & Laughlin, 462 U.S. at 531 n. 6, 103 S.Ct. at 2547 n. 6. This comment suggests that the Court expected the limited vessel liability in Scindia to carry over to dual capacity situations as well. We are not aware of any later case in which the Second Circuit or any other circuit has followed Fanetti's purported enlargement of a vessel's duty in a dual capacity situation.[14] Cf. Guilles, 12 F.3d at 383, 387 (ruling only that a valid cause of action under section 905(b) existed, where the parties had stipulated to the vessel's negligence). Whether called dicta or something else, we cannot comfortably ignore the Court's statement in Jones & Laughlin.
 
 
 35
 Contrary to Fanetti, the Fifth Circuit, which has decided a great number of LHWCA cases, has allocated the same vessel duties of care to dual and single capacity defendants. It regards this approach as in keeping with the Supreme Court's limiting of a vessel's duty of care (e.g., Scindia and Jones & Laughlin ), and with Congress' intent to provide injured workers the same remedies, regardless of whether their employer or another happens to be the legal owner of the vessel.[15]
 
 
 36
 The seminal Fifth Circuit case was Castorina v. Lykes Bros. S.S., 758 F.2d 1025 (5th Cir.), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). There, a longshore worker exposed to asbestos during cargo operations alleged that his employer-vessel owner knew of the harm qua vessel and failed to make the vessel safe. The Fifth Circuit stated that the LHWCA compensation scheme "requires us to separate the negligence of the shipowner and that of the stevedore, even when the shipowner performs its own stevedoring activities." Id. at 1033. Noting that the alleged harm had arisen during stevedoring activities, the court refused to impute any knowledge of this danger by the employer to it as vessel. It explained:
 
 
 37
 To impute this knowledge to a shipowner-employer would be to hold it liable in tort for damages arising from its negligence as stevedore, and effectively to eliminate the exclusivity provisions of sections 905(a) & (b). This result is contrary to the language and purpose of the Act as amended. We therefore hold that the duty owed by a shipowner to a longshoreman under section 905(b) is that established by Scindia and its progeny; this duty is neither heightened nor diminished when the longshoreman is employed directly by the vessel.
 
 
 38
 Id.; accord Tran v. Manitowoc Eng'g Co., 767 F.2d 223, 228 (5th Cir.1985).
 
 
 39
 On the facts of Castorina, it was relatively simple to apply the Scindia duty of care arising from knowledge of an unsafe condition. In a more recent case, the Fifth Circuit considered a situation slightly more analogous to the present. In Levene v. Pintail Enters., 943 F.2d 528 (5th Cir.1991), cert. denied, 504 U.S. 940, 112 S.Ct. 2274, 119 L.Ed.2d 201 (1992), the injured employee was a heavy equipment operator who performed other maritime tasks as well. A captain had instructed Levene to untie another owner's barge, which blocked access to the particular barge they had been instructed to pick up. Levene was injured on the other owner's barge, where grease and scrap materials were present on the deck. See id. at 530.
 
 
 40
 Applying the Scindia duty of turnover and the duty arising from active control over a dangerous condition, the Levene court rejected the employee's claim. The court explained that Scindia did not mandate "extending the duty of a shipowner to protection against hazards on another ship." Id. at 534. "[W]e decline to fashion a general standard of 'reasonable care' that would require a shipowner to protect against any and all hazards a longshoreman might encounter in the course of his work." Id. Further, the court did not view "the fleeing contact between Pintail [the employer-vessel owner] and the BB-242 [the separate owner's barge] as the kind of control that could result in a finding of liability." Id. at 535. It noted that the duty arising from active control over a hazardous condition may be triggered when the dangerous condition is on the vessel itself. See id. (discussing Masinter v. Tenneco Oil Co., 867 F.2d 892, 896-897 (5th Cir.1989), a non-dual capacity case in which the vessel crew was solely responsible for placing a stairway in a way that caused injury to a worker, and the vessel was "contractually bound to conduct the drilling operations and remained in control of the vessel to effectuate this obligation"). Even though the captain "temporarily was in 'command' " of both the vessel and the separate owner's barge, the court found that this did not rise to the level of active control required. Id.
 
 VII. Resolving This Case
 
 41
 We agree with the Fifth Circuit, for similar reasons, that the duties of care described in Scindia should be applied in dual capacity cases insofar as the facts allow. To do so, a court may have to divide the single defendant into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in Scindia. A court may sometimes be assisted in this process by the defendant's internal employment arrangements assigning certain personnel to the "vessel" side of its operation. On occasion, however, the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in Scindia's stevedoring context that Scindia's analysis will become no more than a point of departure. Nonetheless, Scindia's general approach, at least, can be followed and, in many cases, some or all of its express analysis may be useable.
 
 
 42
 The statutory language and the legislative history of the 1972 and 1984 Amendments plainly evidence Congress' intent that the worker's compensation scheme be the primary remedy for all covered workers, regardless of an employer's commercial practice in regard to vessel ownership. See 33 U.S.C. § 905(a) (exclusiveness of employer's liability); 1984 U.S.C.C.A.N. at 2740 ("In the Committee's view, the Longshore Act should be the primary source of compensation for covered workers who are disabled or who may die as a result of a job-related injury or disease.") (emphasis supplied); H.R.Rep. No. 92-1441, 92d Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 4698, 4705 ("[T]he bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services.... The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen ... as apply when an independent contractor employs such persons.") (emphasis supplied). The 1972 Amendments carefully balanced the concerns of employers, vessels, and covered workers. We are not disposed to upset that balance by expanding the liability of employers that act simultaneously as vessel owners, when the statute does not call for such a reading and the Supreme Court has cautioned against it.
 
 
 43
 As already observed, Scindia will sometimes afford less direct guidance on those duties owed to harbor workers than it does on those owed to longshore workers. Courts will need to decide, on a case-specific basis, whether the harbor worker's employment arrangement sufficiently resembles that in Scindia to make particular specifics germane.
 
 
 44
 Here, the employment arrangement is sufficiently analogous to make Scindia a useful guide. The Scindia Court reasoned that once longshore workers came aboard and began carrying out their cargo duties under a stevedore's supervision, the vessel itself had no general duty to exercise reasonable care to inspect for unsafe workplace conditions; rather, it could rely on the longshore worker's employer to do so. See Scindia, 451 U.S. at 172, 101 S.Ct. at 1624. Here, A-K hired harbor workers through the local carpenters union and, as their employer, supervised them as they tended the barges, handling the lines and carrying out construction activities thereon. Both types of activities--construction and scowmen's work--were assigned to them and were performed for A-K qua employer. Workers like Morehead received their daily instructions from A-K's carpenter-foremen, while A-K's project safety manager met periodically with them to discuss site-specific safety issues. Therefore, Scindia's principle of limited liability of the vessel sensibly and logically applies, because the employees effectively assumed control of the barges working under A-K in its capacity as their employer rather than under A-K as the charterer (hence owner) of the barge. A-K qua shipowner had no separate captain and crew assigned to the barge. The allegedly negligent conditions (the open hatch and the absence of warnings) were not attributable to the errors of separate maritime agents acting specifically for the vessel. Rather the alleged acts of negligence were those of fellow harbor workers acting for the employer. Cf. 33 U.S.C. § 905(b) (prohibiting liability of an employer-vessel owner for acts "caused by the negligence of persons engaged in providing stevedoring services to the vessel").
 
 
 45
 Morehead does not assert any breach of the Scindia "turnover" duty (e.g., that A-K, as vessel owner, turned over the barge to the harbor workers knowing or with the duty to have known, of some defect in the barge that later caused injury). He argues only that A-K as vessel violated duties it owed him because, at the time he was injured, A-K as vessel (rather than A-K as employer) allegedly had "active control" over or "actual knowledge" of the open hatch. Cf. Howlett, --- U.S. at ----, 114 S.Ct. at 2063 (noting appellant confined arguments to breach of turnover duty to warn); Elberg, 967 F.2d at 1150 (noting appellant confined arguments to breach of duty to intervene). Equating employment for worker's compensation purposes solely with construction activity, he asserts that no construction purpose, hence no employment purpose, was being pursued at the time of his injury. He draws support from the district court's findings that the barges were set alongside the pier and were not carrying construction equipment. Morehead emphasizes that A-K instructed Breault to open the hatch to air it out so that A-K could exercise what Morehead argues was a vessel function--having a marine surveyor examine the barge before returning it to the owner. He further claims that A-K's safety manager or other carpenter foremen knew or should have known that the open hatch was a potentially hazardous condition. Resting on purported agency principles, Morehead asks us to assign these employees' acts to A-K in its vessel capacity, on the theory that A-K in its vessel rather than employer capacity had control over or knowledge of the open hatch and the failure to warn about it.
 
 
 46
 A-K responds that Breault was performing employment duties when he opened the hatch and when he threw the line to Morehead before the accident. Like Morehead, Breault had been hired both for carpenter and scowman duties. As is typical in the case of harbor workers, as distinct from land-based carpenters, the men were expected to lend a hand with supporting maritime chores as well as pursuing their particular construction trade. A-K maintains that its "active control" over or knowledge about the open hatch into which Morehead fell is therefore attributable to it as employer, not as vessel.
 
 
 47
 We agree with A-K that, for present purposes, the barges tended by its carpenters/scowmen were operated within A-K's control and knowledge qua employer. The barges, which were Breault and Morehead's workplace, can be analogized to the areas of a vessel taken over by longshore workers in the Scindia setting. Under the principles of that case, the stevedore--or, in a dual capacity case, the employer in a stevedore capacity--is ordinarily liable for the safety of the workplace and for any injuries that occur. The vessel, or the employer in its vessel capacity, is not implicated except in the unusual circumstance that the vessel itself continues to exercise active control over the work area.
 
 
 48
 We recognize that a competing analysis is possible, which, however, we reject. A court could attribute Breault's and Morehead's specific activities either to their employer or to the vessel, depending on how the court classified the objectives that those functions were thought to serve. One could inquire whether the hatch was opened to "help" the vessel (i.e., to air it in preparation for returning it to the owner) or, instead, was opened in furtherance of some construction activity. In the former case, it could be argued that the vessel would be liable for any negligence. Such an analysis, however, would involve courts in endless semantical debate. Is an accident while tying up a barge at a construction site in furtherance of a "construction" objective or a "vessel" objective? If both objectives were being served, which predominates? And how does one square the fact that the employees here were hired by the employer for scowmen not just carpenter duties?
 
 
 49
 As noted, the statutory language speaks of the employer's liability as "exclusive." 33 U.S.C. § 905(a). The legislative history and the Court's precedents since 1972 make worker's compensation the primary remedy for an injured employee. The exception in section 905(b) for third-party negligence, narrowed in 1984,[16] explicitly requires a finding of vessel fault. We would be disregarding Congressional intent and might even be returning in the direction of the Sieracki doctrine which did not require such a showing, see supra n. 6, if we were to attribute some of the regular duties that a harbor worker is employed to perform to the vessel, because of their speculative seaman-like character, and only the residue to the employer. This approach would arbitrarily expand a defendant's liability qua vessel in a work arrangement not too different from that in Scindia, i.e., one where the employees have effectively taken over the vessel to carry out their employment duties under their employer's supervision. A similar expansion of liability would follow from too easily assigning any knowledge of A-K employees (such as the carpenter foremen or worksite safety manager) to A-K in a vessel capacity. Neither the statute nor case law seems to us to support such an approach.
 
 
 50
 One of the essential purposes of the 1972 and 1984 Amendments was to provide employees and employers with a greater degree of certainty as to the coverage in effect. The legislative history of the 1984 Amendments documents this concern:
 
 
 51
 [T]he situation in which a worker may be covered at one time, and not covered at another, depending on the nature of the work which the worker is performing at the time of the injury must be avoided since such a result would be enormously destabilizing, and would thus defeat one of the essential purposes of these amendments.
 
 
 52
 1984 U.S.C.C.A.N. at 2736-2737. A "functional" interpretation, hinging the type of liability on the nature and purpose of the duties being performed by covered employees at any given time, would increase uncertainty and the frequency of disputes over the scope of coverage. As Morehead's and Breault's employment contemplated that they would alternate frequently between construction and linehandling, a single, overall classification of their duties is most appropriate for determining the types of remedies available. Cf. Gay, 915 F.2d at 1011 ("[T]o deny Gay [the employee] a cause of action in the morning but to grant him one in the afternoon is to make his rights under the Act as random and indiscriminate as the sea herself. This sort of incertitude is precisely what Congress attempted to eliminate from the LHWCA in both its 1972 and 1984 amendments.") (footnote omitted); cf. Chandris, --- U.S. at ----, 115 S.Ct. at 2187 ("In evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ 'a "snapshot" test for seaman status, inspecting only the situation as it exists at the instant of injury'.... [A] worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured.") (citations omitted).
 
 
 53
 We do not rule out the possibility that in a given case, an injury may be negligently caused by someone acting as the agent of the vessel owner rather than of the employer.[17] Here, however, we see no reason requiring the court to find that Breault, in leaving open the hatch, acted in any capacity other than as A-K's employee rather than as A-K's agent in its shipowner's capacity. Morehead and Breault were hired to perform both construction and scowmen duties. A carpenter-supervisor instructed Breault to open the hatch. A-K's project safety manager generally oversaw the safety of work operations. Morehead has not shown why, in these circumstances, A-K qua vessel would have a duty of care to protect him against the open hatch.
 
 
 54
 We conclude that the district court was not clearly erroneous in viewing the open hatch as a condition temporarily created by A-K as employer, and affirm the district court's judgment in favor of A-K.
 
 
 55
 So ordered.
 
 
 
 [1]
 Although Woods Hole was originally named as a defendant in this action, the district court granted its motion for summary judgment against Morehead, who has not appealed from that decision. Consequently, Woods Hole is no longer a party
 
 
 [2]
 The district court did not definitively find which barge Morehead was on at the time of the accident. The court found "more likely" that Morehead was on the HUGHES 707 and Breault was on the CHER 106, but wrote: "In either event, however, the court would find a single open hatch ... insufficiently obvious. There would seem a presumption that an unmarked 18 inch opening on an otherwise solid deck is a failure of a reasonably safe proffer to one expected to walk thereon. The court would therefore find the barge, whichever one it was, unseaworthy, but under the statute (33 U.S.C. § 905(b)) this is irrelevant."
 
 
 [3]
 See generally Chandris, Inc. v. Latsis, --- U.S. ----, ----, 115 S.Ct. 2172, 2192, 132 L.Ed.2d 314 (1995) (to qualify as a seaman under the Jones Act, "a maritime employee must have a substantial employment-related connection to a vessel in navigation"); Kathriner, 975 F.2d at 659-663 (applying tests of "vessel" under Jones Act and LHWCA). Plaintiff withdrew his maritime claims, including the claim of Jones Act negligence
 
 
 [4]
 Section 904 provides in relevant part: "(a) Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title.... (b) Compensation shall be payable irrespective of fault as a cause for the injury." 33 U.S.C. § 904
 A statutorily covered employee is "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker," except "a master or member of a crew of any vessel" and other limited categories of workers. Id. § 902(3).
 
 
 [5]
 Section 905(b) provides:
 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.
 33 U.S.C. § 905(b).
 
 
 [6]
 See 33 U.S.C. § 905(b). Unseaworthiness is a maritime remedy that was established "simply by showing that some condition or appurtenance on board the vessel at the time of the accident was unreasonably hazardous, even if the stevedore-employer was the sole cause of the hazard." Keller, 38 F.3d at 23 (citing Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946))
 
 
 [7]
 The parties have not disputed on appeal that Morehead is a statutorily covered employee of a statutorily covered employer. As a harbor worker with carpentry and linehandling duties, Morehead meets the statutory definition of a covered employee under section 902(3) and does not fall within any of the categories of workers expressly prohibited from suing under section 905(b)
 
 
 [8]
 In Howlett, the Court suggested that this relationship was the typical one in the longshoring business. See Howlett, --- U.S. at ----, 114 S.Ct. at 2062 ("The injured longshoreman's employer--in most instances, an independent stevedore, see Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)--must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman.") (citations omitted)
 
 
 [9]
 Other courts have applied Scindia duties to LHWCA-covered employees other than longshore workers in the familiar tripartite context. See, e.g., Elberg, 967 F.2d at 1149-1150 (welder); Teply v. Mobil Oil Corp., 859 F.2d 375, 377 (5th Cir.1988) (worker at barge-accessible oil well)
 
 
 [10]
 In Jones & Laughlin, the negligence of the dual capacity defendant qua vessel had been conceded
 
 
 [11]
 Longshore workers such as those in Scindia typically load and unload cargo ships that are operated full-time by a master and crew. Vessel negligence can often be distinguished from stevedore negligence by determining to what extent the dangerous condition was caused, or allowed to persist, by reason of the neglect of the vessel's crew rather than of the stevedoring employees. Harbor workers, however, may work (as here) on construction barges that are moved about by tugs and have no crew as such. As part of their employment, they may do whatever is needed to tend lines and service the barges, besides performing normal construction duties as carpenters, electricians, or the like. Thus, assessing what responsibilities fall within the purview of the vessel's duty of care, as distinguished from the employer's, can be an elusive quest
 
 
 [12]
 As noted, the tugs that towed the barges were captained and crewed by employees of Woods Hole, which supplied the tugs. These employees did not handle the lines on the barges; under union rules, only carpenters/scowmen employed by A-K (such as Morehead) did
 
 
 [13]
 This mix of responsibilities might, in other cases, expand the range of possible remedies available to an injured employee, who must then choose between the mutually exclusive regimes of the LHWCA and Jones Act. See Chandris, --- U.S. at ---- - ----, 115 S.Ct. at 2183-2184 (citing McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 347, 111 S.Ct. 807, 813, 112 L.Ed.2d 866 (1991)). In Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991), the Supreme Court held that a shipyard rigging foreman--who handled lines connecting floating platforms to vessels under repair--was not precluded as a matter of law from seeking a tort remedy under the Jones Act merely because ship repairers are among those jobs specifically enumerated under the LHWCA. See id. at 89, 112 S.Ct. at 492 ("By its terms the LHWCA preserves the Jones Act remedy for vessel crewmen, even if they are employed by a shipyard. A maritime worker is limited to LHWCA remedies only if no genuine issue of fact exists as to whether the worker was a seaman under the Jones Act.")
 Morehead withdrew his Jones Act claim, presumably because he did not believe he could establish Jones Act seaman status. Nonetheless, Morehead has attempted to focus our attention on the vessel-like responsibilities that Breault performed in the period before the injury, as discussed infra. While an emphasis on vessel-type duties may be appropriate for the fact-specific inquiry into seaman status, we place little weight on this attempt to bifurcate vessel and construction activities when these workers were hired to perform both. The definition of a covered employee under the LHWCA excludes "a master or member of a crew of any vessel." 33 U.S.C. § 902(3). It seems inconsistent with this exclusion for Morehead to buttress his claim under the LHWCA with arguments portraying a fellow employee, Breault, as if he were a member of the crew of the vessel. See infra.
 
 
 [14]
 Fanetti might have reached the same result of vessel liability without applying a broader duty of care. The defendant did not dispute that the vessel's crew created the hazard while performing work unrelated to longshoring operations. See Fanetti, 678 F.2d at 426. In this situation, the defendant qua vessel arguably had active control over the crew and knew or should have known about the injury-causing actions, making it liable even under the Scindia standards
 
 
 [15]
 Other courts have followed suit. See, e.g., Halpin v. Atkinson-Kiewit, J.V., 894 F.Supp. 486 (D.Mass.1995) (applying Scindia duties and denying defendant's motion for partial judgment on the pleadings); DiGiovanni v. Traylor Bros., 855 F.Supp. 37 (D.R.I.1994), appeal docketed, No. 94-1775 (finding no violation of Scindia duties where hazard was obvious following "turnover" of the vessel, defendant as vessel lacked "active control" over or knowledge of leak from equipment placed aboard for employment operations, and the circumstances did not give rise to a duty to intervene); Koernschild v. W.H. Streit, Inc., 834 F.Supp. 711 (D.N.J.1993) (applying Scindia duties and denying summary judgment to the defendant where factual dispute existed concerning the plaintiff's awareness of the hazard); Coats v. Luedtke Eng'g Co., 744 F.Supp. 884 (E.D.Wis.1990) (deeming "employer" responsible for providing employee a safe passageway to his job on the vessel, and granting summary judgment to the defendant given its lack of "active control" as vessel over a condition off-board the vessel)
 
 
 [16]
 Cf. Roach v. M/V Aqua Grace, 857 F.2d 1575, 1580 (11th Cir.1988) ("While this [1984] amendment does not disturb the holding of Jones & Laughlin Steel Corp., it does indicate a Congressional intent to limit invokation [sic] of the dual capacity doctrine under the Act.")
 
 
 [17]
 Cf. Pichoff v. Bisso Towboat Co., 748 F.2d 300, 302-303 (5th Cir.1984) (ruling in a dual capacity case that a general manager who ordered a hurried inspection of a fuel tank leak and failed to provide adequate lighting was acting as an agent of the vessel)